57 A.3d 1185

COMMONWEALTH Of Pennsylvania, Appellant

v.

Tony L. BENNETT, Appellee.

Supreme Court of Pennsylvania.

Submitted April 4, 2012.

Decided Dec. 28, 2012.

554

Hugh J. Burns Jr., Philadelphia, Peter Carr, Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Mitchell S. Strutin, for Tony L. Bennett.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

The Commonwealth appeals from the opinion and order of the Superior Court, affirming the order of the Court of Common Pleas of Philadelphia County granting appellee relief from his murder conviction pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. The courts below held that appellee's trial counsel was ineffective for failing to challenge the jury instructions at appellee's 1993 trial for first-degree murder and related charges. In the view of the Superior Court panel, the jury charge violated this

556

Court's subsequent decision in *Commonwealth v. Huffman,*
536 Pa. 196, 638 A.2d 961 (1994), counsel was obliged to object,
and appellee, who was not the shooter of the victim, was
prejudiced by counsel's failure because the charge raised the
prospect that he could be convicted of first-degree murder
without the jury finding that he had a specific intent to kill.
The Commonwealth asserts, among other arguments, that in
deeming counsel ineffective, the lower courts failed to account
for this Court's more recent case law that has "effectively
overruled *Huffman.*"

Upon review, it is apparent that the panel failed to appreci-
ate basic distinctions between this case and the *Huffman* case,
distinctions made clearer by subsequent decisional law the
panel failed to consider. Whether deemed to be of continuing
vitality or not, *Huffman,* the only authority cited to support
the underlying finding that the jury charge here was deficient,
does not support the conclusion of the lower courts. Further-
more, we find that the alternative ground for awarding a new
trial cited by the PCRA court, and renewed by appellee here
in defense of the judgment below, likewise does not support
the new trial awarded. Accordingly, we reverse the order of
the Superior Court and remand to the PCRA court for the
entry of an order denying appellee PCRA relief.[1]

## I. *BACKGROUND*

Appellee conspired with four individuals, Michael Mayo,
Kecia Ray, Kevin Wyatt, and Paul Johnson, to rob a jewelry

1. We enter a dispositive order because the *Huffman*/ineffectiveness
issue accepted for review is the only outstanding issue in this PCRA
matter. In his appeal to the Superior Court following reinstatement of
his PCRA appeal rights (after a prior remand from this Court), appellee
raised six merits claims. The Superior Court found all claims waived
except for the *Huffman*/ineffectiveness claim, upon which it remanded
for an evidentiary hearing. Appellee filed a Petition for Allowance of
Appeal challenging the waiver determination, while the Commonwealth
sought review to challenge the remand. By order dated September 9,
2009, this Court denied both Petitions for Allowance of Appeal. *Com-
monwealth v. Bennett,* Nos. 673 EAL 2008, 602 Pa. 660, 980 A.2d 604
(2009) and 24 EAL 2009, 602 Pa. 660, 980 A.2d 604 (2009). The
current discretionary appeal arises from the remand on the single
*Huffman* issue.

store in Philadelphia at gunpoint. The store was selected because a salesperson, Ms. Ju Yang Lee, had made what the conspirators believed to be an insultingly low offer for a gold chain that Mayo and Johnson earlier had sought to pawn. Appellee Bennett supplied the loaded gun, but did not enter the store, remaining in the getaway car with Wyatt. Mayo and Johnson were caught on videotape entering and robbing the store. During the robbery, Mayo shot Ms. Lee with appellee's gun, killing her.

The shooter Mayo and Ray pleaded guilty to murder, while appellee, Wyatt, and Johnson—all non-shooters—were jointly tried for murder and related crimes before the Honorable Juanita Kidd Stout. Ray testified for the Commonwealth, providing evidence of the conspiracy and testifying that appellee directly abetted the conspiracy by supplying the loaded gun. After the parties rested, Judge Stout instructed the jury on first, second and third-degree murder, as well as voluntary manslaughter. The court also charged the jury on conspiracy and accomplice liability. Relevant to the instant appeal, the court introduced the murder instructions with the following statement:

> Each defendant comes before you charged with murder and voluntary manslaughter.
>
> Now, on this bill, you may find each defendant guilty of murder in the first degree, guilty of murder in the second degree, guilty of murder in the third degree, or guilty of voluntary manslaughter, or not guilty.

N.T., 3/9/92, at 864. The court's first-degree murder instruction then explained that first-degree murder required a finding of an intentional killing, further explicating what "the defendant's" state of mind must be:

> A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing. As used in this statute, intentional killing means among other things a willful, deliberate and premeditated killing.
>
> A killing is willful and deliberate if the defendant consciously decided to kill the victim and it is premeditated if

the defendant possessed a fully-formed intent to kill at the time when he acted and though there need not have been any appreciable amount of time between the time when the defendant first conceived the idea of killing and the time when he acted.

N.T., 3/9/92, at 865–66.

The trial court then instructed the jury on conspiracy, noting that the charges alleged that the criminal objective of this conspiracy embraced, *inter alia,* both murder and robbery:

Now, the defendants come before you charged with criminal conspiracy, the criminal objective of which was murder, robbery, possession of an instrument of crime and violation of the Uniform Firearms Act and the overt act is they did shoot the victim.

Now the definition of criminal conspiracy is as follows:

A person is guilty of conspiracy with another person or person to commit a crime, if, with the intent of promoting or facilitating its commission, he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or agrees to aid such other person or persons in the planning or commission of such crime.

\*     \*     \*     \*     \*     \*

To be guilty of conspiracy and the crimes that are the products thereof, it is not necessary for a person to join the conspiracy at its inception. Collusive behavior of the participant is sufficient to establish the necessary elements of shared criminal intent and agreement.

Where two or more join in the commission of an unjustified assault which results fatally, all are guilty regardless of which one inflicts the mortal wounds. When two or more combine to commit a felony or to make an assault, and in carrying out the common purpose another is killed, the one who enters into the combination but does not personally commit the wrongful act is equally responsible for the homicide as the one who directly causes it.

Co-conspirators are not relieved of liability because he [sic] is not present at the execution of the crime.

Where the existence of a conspiracy is established the law imposes upon the conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators, if such acts are done in pursuance of the common design or purpose of the conspiracy.

Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator and conspirators, and extend even to a homicide which is the consequence of the natural and probable execution of the conspiracy even though such homicide is not specifically contemplated by the parties.

*Id.* at 859, 861–62.

The court then proceeded to charge the jury on accomplice liability, explaining how that theory was distinct from conspiracy liability, as follows:

Now, one may be legally accountable for conduct of another not only if he is a co-conspirator, but also if he is an accomplice who aids and abets the commission of a crime.

Conspiracy is not synonymous with aiding and abetting. Conspiracy requires an agreement to commit a crime, plus an overt act. Aiding and abetting requires participation in the act constituting the offense.

The Criminal Code provides in relevant part that a person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the offense.

It also says that a person is an accomplice of another person in the commission of an offense if, with the intent of promoting or facilitating the commission of the offense, he aids or agrees or attempts to aid such person in planning and committing it.

To aid and abet in the commission of a crime one must possess a shared intent to commit it. One is an aider and abettor in the commission of a crime if he has joined in its

commission, if he was an active partner in the intent which was the crime's basic element.

The degree of concert or collusion between parties to an illegal transaction means the act of one is the act of all. If on the other hand one is only a terrified onlooker, neither his presence at the homicide nor his failure to report it will make him an accomplice an aider and abettor or coconspirator.

*Id.* at 862–63.

During deliberations, the jury asked for clarification of the conspiracy and first-degree murder charges. The trial court read the relevant instructions again. N.T., 3/10/92, at 888–96. Ultimately, the jury convicted appellee of conspiracy, possessing instruments of crime ("PIC"), robbery (two counts), and first-degree murder. On June 1, 1993, the trial court sentenced appellee to a mandatory term of life in prison on the first-degree murder conviction, a consecutive term of ten to twenty years for the first robbery conviction, a concurrent term of ten to twenty years for the second robbery conviction, and a concurrent term of two and one-half to five years for PIC.

The ensuing procedural history of this matter is complicated and is detailed more fully in this Court's decision in *Commonwealth v. Bennett*, 593 Pa. 382, 930 A.2d 1264 (2007). Briefly, appellee did not file a notice of appeal from his judgment of sentence. In 1995, he filed a *pro se* PCRA petition and counsel was appointed. Counsel filed an amended PCRA petition, which was dismissed without a hearing. Appellee filed a *pro se* notice of appeal and the court appointed the same attorney who had represented appellee at trial to represent him for purposes of his PCRA appeal. Counsel failed to file a brief and the Superior Court dismissed the appeal.

Thereafter, appellee filed a second *pro se* PCRA petition, requesting reinstatement of his initial PCRA appeal rights *nunc pro tunc* due to counsel's abandonment of that appeal. The PCRA court granted relief and reinstated appellee's PCRA appeal rights. Appellee filed a notice of appeal and

new counsel was appointed and filed a brief. In a published decision, the Superior Court, sitting *en banc,* quashed the appeal on jurisdictional time-bar grounds, *see* 42 Pa.C.S. § 9545(b), based on this Court's decisional law culminating in *Commonwealth v. Robinson,* 575 Pa. 500, 837 A.2d 1157 (2003). *See Commonwealth v. Bennett,* 842 A.2d 953, 954 (Pa.Super.2004) *(en banc ).* Notwithstanding the jurisdictional holding, the *en banc* majority went on in *dicta* to state that "there was no question that [appellee] was entitled to a new trial" because "the accomplice liability charge given at his murder trial was erroneous and his codefendant at trial was granted a new trial on that basis." The majority further opined that the issue it deemed meritorious had not previously been addressed due to what the majority called the "serial ineffectiveness" of appellee's "various counsel." *Id.* The majority then noted that, in co-defendant Kevin Wyatt's PCRA appeal, a prior Superior Court panel had found, in an unpublished opinion, that the accomplice liability charge at the joint trial "was defective," that Wyatt's trial counsel was ineffective for failing to object to it, and that a new trial was required. *Id.* at 956, citing *Commonwealth v. Wyatt,* No. 2050 EDA 1999 (Pa.Super. filed July 16, 2001) (unpublished memorandum opinion), *appeal denied,* No. 521 EAL 2001, 570 Pa. 698, 809 A.2d 904 (2002) (Commonwealth's appeal) and No. 68 EAL 2002, 573 Pa. 697, 825 A.2d 1261 (2003) (Wyatt's appeal). The majority concluded its discursion into the merits by stating that, "[g]iven that they were tried jointly, there is no question that [appellee] is entitled to relief on the same basis," but the court could not grant a new trial because the petition was timebarred under the PCRA. *Bennett,* 842 A.2d at 956.[2]

2. The *Wyatt* panel's memorandum decision first looked at the charge on co-conspirator and accomplice liability and concluded that the charge impermissibly permitted the jury to convict Wyatt of first-degree murder without a showing of a specific intent to kill or a shared intent, citing to *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982). The panel then looked at the sufficiency of the evidence as prior case law suggested that if the evidence was sufficient to support a finding of first-degree murder the defendant would not be entitled to relief. The panel noted that Wyatt was not present in the store at the time of the shooting and it apparently discerned "no evidence that he shared an intent to kill in the course of the robbery." *Commonwealth v. Wyatt,*

Upon petition by appellee, this Court granted allowance of appeal to consider the jurisdictional question of whether the Superior Court erred in quashing appellee's appeal on time-bar grounds. Ultimately, a closely-divided Court vacated the quashal and held that appellee was entitled to reinstatement of his initial PCRA appeal rights if he could prove the factual predicate to surmount the time-bar. Our vacatur ordered an evidentiary hearing to determine whether appellee's appellate rights should be reinstated *nunc pro tunc*. *Bennett*, 930 A.2d at 1274.

The PCRA court held an evidentiary hearing as directed and ultimately reinstated appellee's right to appeal the dismissal of his initial PCRA petition *nunc pro tunc*. Appellee filed a timely notice of appeal, raising six issues. On October 17, 2008, the Superior Court vacated the PCRA court's prior order denying appellee substantive relief and remanded the matter for an evidentiary hearing for the sole purpose of evaluating appellee's claim that trial counsel rendered ineffective assistance by failing to raise a *Huffman*-based objection to the trial court's jury charge. The panel found appellee's other claims to be waived. Reargument was denied and this Court denied discretionary review to both appellee (concerning his waived claims) and the Commonwealth (concerning the remanded claim).

Thereafter, the PCRA court scheduled an evidentiary hearing. However, appellee's trial counsel had died in the interim and it was therefore impossible to entertain first-hand testimonial evidence respecting why he did not object to the trial court's jury instruction.[3] The PCRA court ordered the matter

slip opinion 7/16/2001, at 14. Next, although no evidentiary hearing had been held, the panel said that it could "conceive of no reason" why counsel would not object to the trial court's charge and thus summarily determined that counsel was ineffective—apparently, in the panel's view, as a matter of law. In equally summary fashion, the panel opined that the prejudice was clear as Wyatt was convicted of first-degree murder.

3. The Commonwealth did not argue below—and does not argue here—that appellee's inability to account for counsel's actual strategy (or non-strategy) in failing to object to the charge fatally compromised appellee's ability to rebut the presumption of effectiveness.

submitted on briefs, and subsequently issued an opinion granting appellee relief, concluding that he was entitled to a new trial on the charge of first-degree murder. In support of its order, the PCRA court cited the same two reasons that had been identified in *dicta* in the Superior Court's time-bar decision, *i.e.*, (1) trial counsel was ineffective in failing to object to the jury charge on vicarious liability and specific intent, and (2) the fact that co-defendant Wyatt was awarded a new trial on a similar claim commanded the same result here. Respecting the jury charge, the PCRA court concluded that the instructions did not provide that the Commonwealth must prove beyond a reasonable doubt that the nonshooter must have the specific intent to kill in order to convict him of first-degree murder. The court found the instruction to be "very similar" to that at issue in *Huffman*, resulting in lowering the Commonwealth's burden of proof, in violation of due process principles. The court further noted that the instruction it deemed erroneous could not be cured by reference to other portions of the charge, especially as the instructions did not distinguish between the intent required for the non-homicide charges and the intent required for accomplice liability for first-degree murder. PCRA court opinion, 10/21/10, at 8–9.

Respecting the claim arising from the new trial relief the Superior Court had awarded to co-defendant Wyatt, the PCRA court believed that it was "only proper that [appellee] in this case be granted the same relief." The PCRA court found that the unpublished memorandum opinion in *Wyatt*, discussed *supra* at note 2, represented the law of the case as it ruled on an ineffectiveness claim arising from the same instructions at issue in appellee's case. Moreover, adverting to the merits *dicta* in the Superior Court's prior opinion in this case, the PCRA court noted that: "the Superior Court made it very clear that [appellee] was entitled to the same relief as his similarly situated codefendant. Where a defendant is identically situated to another defendant who has obtained the requested relief, the first defendant is entitled to that same relief." *Id.* at 10–11; citing also to *Commonwealth v. Cruz*, 578 Pa. 263, 851 A.2d 870 (2004).

The PCRA court also briefly addressed and rejected the Commonwealth's alternative argument related to whether, if relief was warranted, the court should simply modify the first-degree murder conviction to second-degree murder; the court found that such a modification would impermissibly intrude upon the fact-finding province of the jury. *Id.* at 11 (citing *Commonwealth v. Stark*, 526 Pa. 1, 584 A.2d 289, 290 (1990) (stating that "the authority of a trial judge over a jury verdict is limited to consideration of postverdict motions in arrest of judgment or the granting of a new trial.")).

The Commonwealth appealed and the Superior Court affirmed in a brief published opinion. *Commonwealth v. Bennett*, 19 A.3d 541 (Pa.Super.2011). The panel agreed with the PCRA court's view that the jury instruction failed to make clear that appellee, as a non-shooter, could not be convicted of first-degree murder unless the Commonwealth proved that he possessed the specific intent to kill. The court opined that the jury charge failed to distinguish between vicarious liability for first-degree murder and vicarious liability for other charged offenses, such as robbery. The court was unconvinced by the Commonwealth's argument that the instructions were sufficiently clear when the first-degree murder instruction was considered in conjunction with the conspiracy charge, explaining that the conspiracy instruction suggested that appellee's liability "could arise simply by virtue of his joint participation with the shooter in the robbery." *Bennett*, 19 A.3d at 544.

In its analysis of both the underlying charge and counsel's performance, the panel cited only to *Huffman* and did not consider any of this Court's subsequent decisions interpreting and applying *Huffman*. This lapse is curious because the central thrust of the Commonwealth's brief to the Superior Court was that the jury charge in this case was "substantially identical" to jury charges that this Court had approved in cases decided after *Huffman*, decisions which, the Commonwealth argued, the PCRA judge had erroneously "overlooked." Thus, the panel inexplicably failed to engage the actual lead argument forwarded on the Commonwealth's appeal, instead measuring the charge against its understanding of *Huffman*—

in isolation. Nor did the panel provide an independent analysis of the *Strickland/Pierce*[4] test for ineffectiveness, focusing only on the perceived deficiency in the charge, measured against *Huffman*, and the prejudice resulting from a deficient charge on specific intent. Turning to the PCRA court's alternative holding—that appellee was entitled to relief because his co-defendant Wyatt had been awarded a new trial—the panel noted that, given its conclusion that counsel was ineffective for failing to object to the charge, it need not discuss this ground for decision. Finally, the panel responded briefly to the Commonwealth's alternative argument on verdict modification by footnote, summarily stating only that "[w]e are not jurors and, as such, decline the Commonwealth's invitation" to "vacate the first-degree conviction and convict Bennett of second-degree murder." *Id.* at 544 n. 2.

This Court granted the Commonwealth's petition for allowance of appeal, directing the parties to address two issues framed by the Commonwealth as follows:

(1) Does the Superior Court's published decision overturning [appellee's] first-degree murder conviction on the basis of a supposedly defective accomplice liability instruction overlook and contradict this Court's precedent?

(2) In the alternative, did the Superior Court contravene this Court's precedent by failing to modify the judgment to the lesser-included offense of second-degree murder, which was unaffected by the supposedly erroneous jury instruction?

*Commonwealth v. Bennett*, 612 Pa. 597, 32 A.3d 586 (2011) (*per curiam*).

## II. *PARTIES' POSITIONS*

The Commonwealth's central argument on appeal does not focus on the elements of an ineffective assistance of counsel claim, but proceeds directly to the underlying defaulted claim

4. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

concerning *Huffman.* The Commonwealth asserts that the claim lacks merit under this Court's decisional law—including decisions rendered since *Huffman,* which the lower courts did not consider—and thus counsel cannot be deemed ineffective. Specifically, the Commonwealth argues that the jury charge in this case, when considered as a whole, adequately instructed the jury that appellee could not be found guilty of first-degree murder as an accomplice or conspirator unless he intended to promote the commission of that crime and shared the intent to commit it. The Commonwealth points to the accomplice and conspiracy liability portions of the charge where the trial court instructed the jury that appellee had to possess the "intent of promoting or facilitating" the commission of the offense in order to be found guilty. Furthermore, the Commonwealth notes that the accomplice liability charge instructed the jury that an accomplice must possess "a shared intent" to commit the crime charged and be "an active partner in the intent which was the crime's basic element."

The Commonwealth also compares the instructions in this case to those at issue and deemed adequate in cases such as *Commonwealth v. Speight,* 578 Pa. 520, 854 A.2d 450 (2004), arguing that they are "essentially identical." The Commonwealth emphasizes that the Superior Court limited its consideration to the *Huffman* decision, ignoring the Commonwealth's argument concerning more recent decisional law from this Court. The failure of the panel to appreciate the state of the controlling law is problematic in itself; but, the Commonwealth adds, it is also notable that, since the Superior Court issued its decision here, this Court has decided another case with a *"Huffman"* issue, in which the Court noted that *Huffman* has been "effectively overruled" by the very cases this Superior Court panel failed to consider. *See Commonwealth v. Maisonet,* 612 Pa. 539, 31 A.3d 689, 694 n. 2 (2011), citing *Commonwealth v. Daniels,* 600 Pa. 1, 963 A.2d 409, 429–32 (2009).

The Commonwealth alternatively contends that even if *Huffman* remains good law, the circumstances here are distinct because the ambiguous instruction in *Huffman* suggested

that Huffman, who was tried along with his sole co-conspirator, could be convicted of first-degree murder if either he **or** his co-defendant possessed the specific intent to kill. Moreover, the Commonwealth postulates that the *Huffman* trial court did not provide an appropriate accomplice liability instruction. In contrast, the Commonwealth argues that the trial court here never instructed the jury that it could convict the co-defendants on trial—who did not include the shooter—of first-degree murder based on a conspirator's intent to kill. Furthermore, if there was any error in the instructions, the Commonwealth argues, appellee was required to show prejudice under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); prejudice is not assessed by the harmless error standard that governed the direct appeal in *Huffman.*

Finally, the Commonwealth contends that even if appellee is entitled to some form of relief on his ineffectiveness/jury instruction claim concerning first-degree murder, the proper remedy is to modify the judgment to the lesser-included crime of second-degree murder. The Commonwealth avers that an appellate court has the authority to modify any appealable order, including a judgment of sentence, pursuant to 42 Pa. C.S. § 706. According to the Commonwealth, this Court has made clear that when an error affects only a discrete element of the offense, the proper remedy is to modify the judgment to a lesser-included offense that does not contain the element. Brief of Commonwealth, at 18, citing *Commonwealth v. Alexander,* 477 Pa. 190, 383 A.2d 887 (1978). The Commonwealth contends that the U.S. Supreme Court has also endorsed the practice of modifying a judgment to a lesser-included offense, citing *Rutledge v. United States,* 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996). The Commonwealth avers that the lower tribunals erred in not following this practice, since the disputed jury instruction had no effect on the jury's determinations that appellee was guilty of robbery and the victim indisputably was killed by Mayo in the course of that robbery—the twin elements of felony murder. Thus, the lower tribunals should have modified the judgment from first-degree

to second-degree murder, an offense that requires the same mandatory sentence of life in prison required for non-capital first-degree murder.

Appellee responds that the trial court's instructions failed to convey that he could not be convicted of first-degree murder unless he intended to promote the commission of that crime and shared the specific intent to commit it. Appellee argues that due process is violated when an instruction reduces the Commonwealth's burden. The jury instructions in this case relieved the Commonwealth of this burden, appellee says, because the jury was never informed that the Commonwealth must prove that he had the specific intent to kill. Appellee also renews his alternative argument, which was accepted by the PCRA judge, that he and co-defendant Kevin Wyatt were standing side-by-side during the robbery and murder and since Wyatt was granted a new trial on the basis that his counsel was ineffective in failing to object to the same jury instruction, he is entitled to identical PCRA relief.

Appellee separately responds to the Commonwealth's argument that the state of the decisional law has changed, arguing that *Huffman* has not been expressly overruled and contending that a *Huffman* claim remains viable where a trial court fails to make clear that an accomplice may be convicted of first-degree murder only where the Commonwealth proves that the accomplice possessed the specific intent to kill. Appellee distinguishes the more recent cases from this Court on the grounds that an otherwise defective jury instruction may be proper when considered in the context of a case, *e.g.*, if the defendant was identified as the principal rather than an accomplice, or where the defendant was charged only with a criminal conspiracy to kill. Thus, appellee distinguishes *Commonwealth v. Daniels*, a case involving jury instructions similar to the ones issued here, on the factual grounds that the robbery in *Daniels* was secondary to the murder. In contrast, appellee alleges, robbery was the primary object of the conspiracy here. Additionally, appellee notes, the *Daniels* Court indicated that the jury there could have found that both defendants were principals in the murder, since the two men

acted in concert and both were inculpated in the shooting, depending on whose version of the shooting the jury believed. Conversely, in this case, the jury could not have found that Wyatt or appellee were principals in the murder, since the evidence showed that only Mayo and Johnson went into the store, and Mayo shot the victim; thus, the jury necessarily had to find appellee guilty of first-degree murder as an accomplice (or a conspirator) and not as a principal.

Appellee also asserts that the conspiracy instruction in this case made no distinction between vicarious liability for first-degree murder and for the other charged offenses, such as robbery. According to appellee, that instructional error was compounded by the prosecutor's closing, which argued that if the defendants were part of a conspiracy to commit robbery, they were equally responsible for any murder that occurred during that robbery. Thus, appellee says, the jury could have believed it could convict him of first-degree murder if it merely believed that he shared the intent to commit one of the underlying crimes. Appellee relies on decisional law from the U.S. Court of Appeals for the Third Circuit in further support of this position, citing *Smith v. Horn*, 120 F.3d 400 (3d Cir.1997), *Everett v. Beard*, 290 F.3d 500 (3d Cir.2002), *Bronshtein v. Horn*, 404 F.3d 700 (3d Cir.2005), and *Laird v. Horn*, 414 F.3d 419 (3d Cir.2005).

Responding to the Commonwealth's alternative argument, appellee maintains that there is no authority to modify the judgment to second-degree murder. First, appellee argues that there is some doubt about whether second-degree murder is a lesser-included offense of first-degree murder. Second, appellee contends that the cases relied upon by the Commonwealth do not support the proposition that a court has the authority to so modify a jury's verdict. Instead, those cases raised issues of sufficiency of the evidence or legality of the sentence and did not involve a defective jury instruction. Finally, the jury in this case never specifically found appellee guilty of second-degree murder. Appellee submits that, to modify the verdict would involve an appellate court substitut-

ing its judgment for that of the jury and would infringe upon his right to a jury trial under the Sixth Amendment.

The Commonwealth has filed a reply brief, responding to each of appellee's arguments. First, the Commonwealth reiterates its view that *Huffman* has been effectively overruled by subsequent decisional law and disputes appellee's points in distinction of those cases. Second, the Commonwealth notes that the Third Circuit decisional law appellee cites is not controlling and, in any event, the cases address dissimilar jury instructions. Third, the Commonwealth avers that the fact that codefendant Wyatt was granted collateral relief in an erroneous and unpublished Superior Court decision does not establish a basis for collateral relief here, since counsel cannot be ineffective for failing to challenge a jury instruction that was determined to be unobjectionable in subsequent decisions by this Court. Reply Brief, at 11 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)).

## III. *ANALYSIS*

### A. *General Background*

The cognizable claim on this PCRA appeal is whether trial counsel was ineffective in failing to object to the court's charge on grounds that the charge did not convey the requirement of specific intent in a first-degree murder prosecution premised upon accomplice and conspiracy liability. Counsel is presumed to be effective, *Commonwealth v. Jones*, 590 Pa. 202, 912 A.2d 268, 278 (2006); to overcome the presumption, appellee has to satisfy the performance and prejudice test set forth in *Strickland*. In Pennsylvania, we have applied the *Strickland* test by looking to three elements, whether: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) the defendant has shown that he suffered prejudice as a result of counsel's lapse, *i.e.*, that there is a reasonable probability that the result of the proceeding—here, the trial and verdict of guilt for first-degree murder—would have been different if counsel had objected. *Commonwealth v. Pierce*,

515 Pa. 153, 527 A.2d 973, 975 (1987). If a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first. *Strickland, supra; Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 701 (1998).

■ The resolution of a claim of ineffective assistance can have both factual and legal elements, depending upon the circumstances. *See Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822, 830 (2005). In this case, however, trial counsel was never heard from; the courts below essentially found that the charge was erroneous as a matter of law; that counsel was required to object to it; and that appellee was prejudiced. Because the ruling below is not dependent upon matters other than the pure legal elements of a *Strickland* claim in the circumstance here, our review is plenary and non-deferential. *Id.*

As we have noted, the lower tribunals were persuaded that the charge here violated *Huffman*; but, in so holding, both courts inexplicably failed to acknowledge or discuss the extensive post-*Huffman* decisional law from this Court cited by the Commonwealth, including cases which, unlike *Huffman*, involved collateral attacks upon jury charges raised as Sixth Amendment claims of counsel ineffectiveness.[5] Upon review,

5. Preliminarily, we note that, at the time of appellee's trial, *Huffman* had not been decided. Thus, there arguably is a question as to whether trial counsel can be faulted for failing to forward a *Huffman*-style objection prior to *Huffman*. The Commonwealth does not press such an argument, however.

This Court has suggested the answer to the question on two prior occasions. In *Commonwealth v. Chester*, 557 Pa. 358, 733 A.2d 1242 (1999), we noted that the adequacy of the accomplice liability instruction in that case had been finally litigated on direct appeal and was not subject to reconsideration on collateral review. Nevertheless, we stated that the charge given was facially inconsistent with *Huffman* and that the *Huffman* decision was grounded on the earlier decision in *Bachert*, a case involving a sufficiency challenge, and thus, *Huffman* "did not create new law." *Chester*, 733 A.2d at 1253 n. 12.

We adverted to similar reasoning in *Daniels*, 963 A.2d at 430, noting that *Huffman* was the only case relied on by the PCRA court in granting relief to the appellees and that *Huffman* post-dated the trial. Nevertheless, for decisional purposes *Daniels* assumed that a *Huffman*-type objection was available to reasonably competent counsel based on *Bachert* and the fact that trial counsel in *Chester* forwarded a similar

we conclude that the essential predicate finding that the jury charge here violated *Huffman* is not sustainable in its own right, in light of both the charge when read as a whole and the factual circumstances of this case.

### B. *Vicarious Liability Instructions in First–Degree Murder Cases*

#### 1. *Commonwealth v. Huffman, 638 A.2d 961 (Pa.1994)*

In *Huffman*, the appellant was tried jointly with his sole co-conspirator, Eric Grier, and was convicted of murder of the first-degree for the beating death of a man during the burglary of Grier's place of employment. Huffman was also convicted of conspiracy, robbery, and burglary; he was sentenced to death for the murder. On direct appeal, this Court described the crime as follows: Grier left a door to the office area unlocked the day of the murder; that evening Grier and Huffman walked together into the office area; one or both of them entered the office and beat the victim about the head with an iron pry bar; they then stole some items, left, sold the stolen goods, and bought drugs with the proceeds; and they reentered later that night, stole more items, then left and sold those items. We added that the evidence as to the actual killing itself was "quite limited" as Huffman and Grier each chose not to testify, and their prior statements regarding the actual killing were redacted since each apparently implicated the other in the killing. 638 A.2d at 961–62.

At trial, Huffman objected that the trial court's instruction to the jury on vicarious liability was improper because it failed to advise that he must possess the specific intent to kill in order to be found guilty of first-degree murder. In finding merit to that preserved claim on appeal, this Court quoted what we described as "the jury instruction as to accomplice and co-conspirator liability" as follows:

objection at trial, which was ultimately rejected on direct appeal, prior to *Huffman*. *Daniels*, 963 A.2d at 429–30. Furthermore, the *Huffman* court suggested that *Bachert* had made this point clear when it stated that "this Court's express and unambiguous language in *Bachert*, seems to have gone completely unheeded by the trial judge in the instant case." *Huffman*, 638 A.2d at 962–63 (referring to jury charge).

Thus, in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

*Id.* at 962.

The Court held that this two-sentence charge was "quite simply, a patently erroneous statement of the law." Quoting *Bachert,* we explained that, " '[t]o determine the kind of homicide of which the accomplice is guilty, it is necessary to look to *his* state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one *which the accomplice harbored and cannot depend upon proof of the intent to kill only in the principal.' " Id. (quoting Bachert, 453 A.2d at 935) (italics added by *Huffman* Court). The Court then found that the charge allowed the jury to reach a first-degree murder verdict without a finding of the requisite mental state of specific intent to kill. Finally, the Court concluded that the error was not harmless beyond a reasonable doubt because, under this instruction, "the jury needed to find only that the appellant had conspired to commit or assisted in a burglary with the actual murderer in order to find him guilty." *Id.* at 963.[6]

6. *Bachert* did not involve a jury instruction, but was a challenge to the sufficiency of the evidence for first-degree murder. Bachert and a cohort, Charles Webber, were hitchhiking when they were picked up by the victim. Webber shot and killed the victim and the cohorts took the victim's car. The question presented was whether the lack of direct evidence of what occurred in the victim's car prior to and at the time he was shot precluded a first-degree murder verdict for defendant Bachert. The Court stated the relevant law, which was quoted verbatim in *Huffman* (and recounted above) related to vicarious liability for first-degree murder, noting that it required evidence beyond a reasonable doubt that the accomplice had the specific intent to kill. We ultimately concluded that the defendant's statements "we stole a car" and "we shot a guy" were sufficient for the jury to conclude that the defendant had the specific intent to kill. *Bachert,* 453 A.2d at 935–36.

2. *Cases Applying Huffman of Particular Relevance Here*

Soon after *Huffman*, this Court considered its application in an appeal arising on discretionary review, involving a claim of ineffectiveness for failing to object to the trial court's accomplice liability instruction. In *Commonwealth v. Thompson*, 543 Pa. 634, 674 A.2d 217 (1996), Junior Thompson and his co-conspirator "Danny" approached a group of people walking on a sidewalk. As they approached, Thompson handed Danny a loaded gun. Danny pointed the gun at the victim, ordered him to lie face down on the sidewalk, and then shot the victim two times in the back. Witnesses testified that it sounded as if more than one weapon was being fired as Thompson and Danny fled the scene, and the police in fact found two different types of bullets at the scene, that could not have been fired from the same gun.

Thompson went to trial alone and was convicted of, *inter alia*, first-degree murder. The accomplice liability issue he presented on appeal relied exclusively on *Huffman*. In a unanimous opinion written by the author of the *Huffman* decision, this Court rejected the issue, noting that Thompson's reliance on *Huffman* was misplaced. First, the Court explained that the charge given in *Huffman* was incorrect, whereas the accomplice liability charge given in *Thompson* correctly stated the law. The Court then set forth the accomplice liability charge in *toto*, which included the following instruction:

> You may find the Defendant guilty of the crime on the theory that he was an accomplice as long as you're satisfied beyond a reasonable doubt that the crime was committed and that the Defendant was an accomplice of the person who committed it.

*Thompson*, 674 A.2d at 223. The Court noted that this legally correct accomplice liability charge was preceded by the definitions of the different degrees of murder and the definition of specific intent. In rejecting Thompson's reliance on *Huffman*, the Court succinctly declared that "[a]ppellant apparently reads our decision in *Huffman* as requiring that the legal concepts of accomplice liability and first degree murder be

revealed to the jury by a set pattern of magic words. Appellant is in error." *Thompson,* 674 A.2d at 223. As the overall charge was legally correct, the Court concluded that counsel was not ineffective for failing to object to it.

The Court reached a similar result in *Commonwealth v. Simpson,* 562 Pa. 255, 754 A.2d 1264 (2000), a direct capital appeal. Rasheed Simpson and three others kidnapped Andrew Haynes for ransom. The Haynes family was unable to pay the ransom, and within hours the police found Haynes' body in a vacant lot, with four bullet wounds in the back of his head. Simpson was tried for the kidnapping and murder with one of his coconspirators. The Commonwealth was unable to prove exactly which (or how many) of the kidnappers had shot Haynes. The jury convicted Simpson of first-degree murder and sentenced him to death.

Before the Court, Simpson argued that the trial court erred by not instructing the jury that it could only convict him of first-degree murder as an accomplice or coconspirator if he harbored the specific intent to kill. The Court rejected Simpson's argument. The Court recounted the first-degree murder instructions in total, which included a direction that "each defendant is on trial individually.... Therefore, in order to [find] the defendant guilty of murder of the first-degree, you must find that the defendant had the specific intent to kill and that the killing was willful deliberate and premeditated." *Id.* at 1274–75. The opinion also set forth the relevant portions of the accomplice and conspirator liability charges in a footnote; (those charges were similar to the standard jury instructions on accomplice and co-conspirator liability).

The Court concluded that the jury instructions "coherently and unambiguously" informed the jury that the Commonwealth needed to establish specific intent to kill beyond a reasonable doubt before Simpson could be convicted of first-degree murder. The Court emphasized the importance of viewing the instructions in their entirety, and noted that the first-degree murder charge informed the jury that it had to find that "the defendant" had the specific intent to kill. We

cited *Thompson*, noting that "the trial court is not required to deliver its instructions regarding first-degree murder and those regarding accomplice and conspiratorial liability in a prescribed manner," so long as the "instructions properly and adequately assess the law." *Simpson*, 754 A.2d at 1275–76.

The Court then distinguished *Simpson* from *Huffman*, explaining that in *Simpson* the trial court had stressed in its first-degree murder instruction that Simpson's state of mind was to be examined separately from that of his co-conspirators. The trial court had also communicated to the jury that Simpson had to harbor his own specific intent to kill to be found guilty of first-degree murder. We then noted that the vicarious liability instructions "did not detract from the clear message that the jury must find that [Simpson] had the specific intent to kill to support a first-degree murder conviction." *Id.* at 1276. Accordingly, we concluded that the trial court had properly informed the jury that it must find that Simpson had the specific intent to kill in order to be convicted of first-degree murder.

### 3. *Analysis*

██ *Thompson* and *Simpson* do not comprise the entire universe of this Court's cases construing *Huffman*, but they are example enough to conclusively prove the error in the decisions below. *Huffman* addresses a circumstance where a jury charge is erroneous in that it incorrectly instructs the jury that it may find the defendant guilty of first-degree murder if it determines that **either** he **or** his co-defendant/co-conspirator/accomplice possessed the specific intent to kill. Such a charge is problematic because it relieves the Commonwealth of its burden to prove specific intent as to each individual defendant charged with first-degree murder in a multiple-defendant scenario.[7] However, *Huffman* is of limited

---

7. The two-sentence jury charge quoted and analyzed in *Huffman* was described by this Court as "the jury instruction as to accomplice and co-conspirator liability" in that case, *Huffman*, 638 A.2d at 963, but it does not appear that those two sentences reproduce the entirety of the trial court's commentary on the relevant concepts. *Huffman* was a capital case and this Court has access to the record in many capital

assistance when the jury charge does not present such an error.[8] In the matter *sub judice*, there is no *Huffman*-style

cases. While we must accept that the *Huffman* Court decided the case on the premise that the two quoted sentences comprised the only relevant part of the charge concerning vicarious liability, in point of fact the quoted portion of the jury instruction was part of the instructions on first-degree murder.

The portion of the "relevant" charge quoted in *Huffman* was introduced by the trial court posing the question "[n]ow, what is murder of the first degree?" The court then read the first-degree murder statute, which defined the crime as "a criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." Immediately thereafter, the court made the statement that formed the basis of this Court's decision:

> Thus, in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

N.T. (*Huffman*), 3/8/90, at 30. The court then defined "intentional killing." A review of the entirety of the charge reveals that the *Huffman* trial court addressed the concepts of accomplice and conspiracy liability separately, aspects of the charge which were not discussed by the *Huffman* Court. *Id.* at 21, 41–44 (conspiracy charge, limited to conspiracy to commit burglary).

Notwithstanding this complication, the error identified by the Court in Huffman was meaningful, because the jury was never given the standard first-degree murder charge encompassing the specific intent requirement and was therefore left to believe that it could convict each of the co-defendants of first-degree murder so long as the killing was intentional, regardless of whether the individual defendant possessed the specific intent to kill.

8. The cases following *Huffman* in which an instructional error has been found (although relief has not been granted for other reasons) involve substantially similar charges to the one issued in *Huffman* or a misstatement of the law as to vicarious liability for first-degree murder. *See Commonwealth v. Speight*, 578 Pa. 520, 854 A.2d 450, 460 (2004) (instruction provided: "Now, murder of the first degree, members of the jury, is a criminal homicide committed with a specific intent to kill.... Now, if you believe that the defendant **or his accomplices or co-conspirators** intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which **you may infer that the defendant had the specific intent to kill.**") (emphases added); *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456, 463 (1998) (jury instruction provided that defendant could be liable as a co-conspirator if someone else in conspiracy committed killing, and "[i]f the person who pulled the trigger had the malice and the intent to either kill or cause serious bodily harm, then

error in the jury charge, making the matter more aligned with *Thompson* and *Simpson* and distinct from *Huffman.*

The charge here, which is recounted at length above, was far more extensive than the charge reviewed in *Huffman.* Like the instruction in *Simpson,* the introduction to the murder portion of the jury charge clarified that it pertained to "each" defendant. The first-degree murder charge clearly and correctly informed the jury that "each" defendant could be found guilty of first-degree murder only if "the defendant possessed a fully-formed intent to kill at the time when he acted." N.T., 3/9/92, at 865. Thus, the jury was properly informed that appellee needed to possess the specific intent to kill in order for him to be found guilty of first-degree murder.

Furthermore, the portion of the charge related to co-conspirator and accomplice liability did not materially detract from this correct first-degree murder instruction, but rather properly informed the jury of the law related to vicarious liability. Nevertheless, the Superior Court determined and appellee urges that the vicarious liability instructions could have led jurors to conclude that appellee, by virtue as his role as an accomplice or co-conspirator to the other crimes charged, was equally responsible with the shooter for first-degree murder even without proof that he possessed the specific intent to kill.

However, such a determination overlooks that at the time of appellee's trial, *Huffman* had yet to be decided. The only clear statement by this Court regarding vicarious liability for first-degree murder came from *Bachert. Bachert* required that the jury must be instructed to consider the defendant's state of mind before being convicted of first-degree murder. When the entire jury charge is considered, including the clear direction to the jury that it must find that each individual defendant had the specific intent to kill before that defendant could be convicted of first-degree murder, it is clear that the trial court complied with this directive. Furthermore, *Huffman* did not venture to expand or alter the *Bachert* Court's

the co-conspirator would be liable even if he didn't have that particular mental state, himself").

directive, but merely explained how the jury instruction there did not comply with it. As we have explained, the instruction given here did not contain the type of error that formed the basis for the *Huffman* decision.

Similarly, appellee and the courts below read *Huffman* in a fashion that is broader than the case warrants, appearing to believe that *Huffman* requires an explicit statement related to first-degree murder as an accomplice or conspirator. But *Huffman*, as clarified by *Thompson*, does not require "magic words" by the trial court, so long as the charge, when read in its entirety, appropriately conveys that an accomplice or co-conspirator must possess the specific intent to kill in order to be found guilty of first-degree murder. *See Thompson, supra.*

We recognize that appellee's argument is not entirely without foundation as this Court has suggested, in *dicta*, that in instances implicating vicarious liability for first-degree murder, the trial court must "clarify for the jury that the specific intent to kill necessary for a conviction of first-degree murder must be found present in both the actual killer and the accomplice." *Chester*, 733 A.2d at 1253 n. 12. The statement suggests an approach similar to that advocated by appellee.

Nevertheless, as we have explained, *Huffman* did not purport to establish a particular manner of conveying the necessary concepts to the jury, much less by particular "magic words"; the charge was substantively problematic in *Huffman*. Any doubt as to the breadth of *Huffman* was clarified two years later by the decision in *Thompson*. Furthermore, the jury instruction question in *Chester* was deemed to have been "finally litigated [on direct appeal] for purposes for PCRA review," and relief was denied on that basis. The quoted statement was merely offered as part of what the Court described as an "acknowledgment" that Chester's allegation had "arguable merit."

We need not test whether the *Chester* Court's acknowledgement was accurate in some absolute sense, *i.e.*, by looking at the jury instructions there or the factual circumstances surrounding the crime, because this area of the law is gov-

erned by the actual merits holdings in other cases not discussed in *Chester*. Again, it is clear, the trial court need not issue a specific charge via magic words, so long as the substance of the teaching of *Bachert* and *Huffman* is satisfied.[9]

Furthermore, even if we were to assume that the *Chester* Court's purported expansion of *Huffman* was appropriate and correct, no relief is due here because of the ineffectiveness overlay; counsel will not be faulted for failing to predict a change in the law. *See Commonwealth v. Colavita*, 606 Pa. 1, 993 A.2d 874, 894 n. 13 (2010) (explaining that a *Strickland* ineffectiveness finding cannot be premised on hindsight evaluation). The preserved jury instruction challenge in *Huffman* was borne from this Court's pronouncement in *Bachert* that the accomplice's state of mind is the relevant consideration when determining whether he had the specific intent to kill. *Bachert* was the relevant law at the time of appellee's trial and certainly did not require the specific "magic words" that were later envisioned by the *Chester* Court's *dicta*, and are advocated by appellee. Thus, trial counsel cannot be faulted for failing to object to the jury instructions based on an opinion that was five years in the future.

In short, the courts below engaged in a broad reading of *Huffman* which both failed to come to terms with the actual charge in its entirety and failed to appreciate the further guidance provided by this Court's subsequent decisions in this area. The broad reading is also problematic for another reason: it loses sight of the difficulty actually presented and perceived in *Huffman*.

9. We note that the Pennsylvania Suggested Standard Criminal Jury Instructions now include a specific charge related to liability for the conduct of another person for the crime of first-degree murder for both accomplice and conspiracy liability. *See* Pa. Suggested Standard Criminal Jury Instructions § 8.306(b) (both accomplice and conspiracy) and § 8.306(b)(1) (accomplice liability) (Revised April 2005). However, these are merely suggested instructions and we have repeatedly cautioned "[t]he trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *See Commonwealth v. Smith*, 609 Pa. 605, 17 A.3d 873, 906 (2011) (collecting cases).

■ The manner by which a killing is accomplished can provide an inference of specific intent to kill: *i.e.*, the use of a deadly weapon upon a vital part of the victim's body allows such an inference. *See, e.g., Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 583 (1998). The specific danger that the *Huffman* Court addressed was the prospect of a jury being permitted to infer specific intent as to multiple co-defendants based upon an apparently intentional killing, through speculation as to the factual circumstances surrounding that killing, including which of multiple co-defendants delivered the blows that imply a specifically intended killing. *See also, e.g., Wayne*, 720 A.2d at 465. *Huffman* and *Wayne* involved a *sui generis* circumstance where there are multiple actors, but the identity of the actual "killer" is unknown, such as where co-defendants on trial incriminate each other as the actual killer, as was the case in *Huffman*, or where the identity of the shooter is unknown altogether, as was the case in *Wayne*.

In the case *sub judice*, the issue of concern to the Court in *Huffman* was simply not present as the jury was not left to speculate concerning which person in the conspiracy pulled the trigger. The killer was always identified as Michael Mayo and there was no question as to his role in the killing, and the distinct roles of his conspirators. Indeed, the jury was shown a video from the jewelry store identifying Mayo as the shooter. Furthermore, Mayo was not on trial with appellee and his other co-defendants. Thus, the jury was well aware that none of the co-defendants on trial were the actual shooter; and when the court's charge spoke of the defendant or defendants, it was not speaking of Mayo.

Thus, the first-degree murder instruction here referred only to the **non-shooter** defendants actually on trial, and did not encompass Mayo. The danger of a two-sentence instruction such as that stressed by the *Huffman* Court is obvious when there is no specific evidence as to which co-defendant committed the actual killing: that danger is not present when but one co-defendant delivers the fatal blow, his identity is known, and the shooter's trial is not joined with that of his conspirators.

Furthermore, *Huffman* is inapposite because the evidence in this case did not leave room for the jury to speculate concerning the factual circumstances surrounding the killing, including who actually fired the fatal bullet. Appellee actively conspired to participate in the robbery of the jewelry store. Unlike Wyatt, appellee was not merely involved as a lookout and in the "getaway" stage of the crime: rather, he provided Mayo with the loaded gun that was then used to murder Ju Yang Lee in the course of the robbery. Not all robberies are committed with guns; and not all guns used to accomplish robberies are loaded. Given these circumstances, the jury was not left to speculate as to appellee's role in the conspiracy and was given sufficient information to guide its task in determining whether appellee possessed the specific intent to kill.

Appellee attempts to distance himself from our developed case law and the conclusion it necessarily produces, by suggesting that this conspiracy had multiple objectives, and the trial court's instruction made no distinction between liability for first-degree murder and liability for the remaining charges, including robbery. Thus, he says, a jury could have convicted him of first-degree murder simply by finding that he was an accomplice or co-conspirator respecting the robbery. Appellee argues that the general nature of the co-conspirator liability charge did not adequately convey that he had to possess a specific intent to kill. He points to case law from the Third Circuit in support of his position.

The argument is without merit. As we have made clear, the instant case is simply not controlled by *Huffman*, and the jury charge must be viewed in its entirety—the default rule in reviewing jury instructions, and a rule enforced in *Thompson* and our ensuing decisions involving *Huffman*. In this case, the jury instructions on first-degree murder and vicarious liability were correct. Again, the jury in this case from the evidence presented knew who the shooter was, the "defendants" adverted to in the charge did not include the shooter, the jury was not passing upon the shooter's conduct, and the jury was not invited to infer a specific intent to kill as to any

of the co-defendants based solely upon the shooter's conduct. We need not review and compare each of the federal cases appellee cites concerning *Huffman;* even if we assumed that those cases support appellee's position as argued here, for the reasons we have explained above, we are unpersuaded by the argument—and, of course, we are not bound by the decisional law of the lower federal courts, construing Pennsylvania law. *See, e.g., Stone Crushed Partnership v. Kassab Archbold Jackson & O'Brien,* 589 Pa. 296, 908 A.2d 875, 884 n. 10 (2006) (this Court is not obligated to follow decisions of Third Circuit).[10]

The elemental error by the lower courts in this case (including the initial Superior Court *en banc* panel) consisted not only of an inexplicable failure to consider controlling, subsequent cases by this Court—cases specifically argued by the Commonwealth—but also a failure to read closely the relevant jury charge as a whole, and a failure to closely read *Huffman.* The finding that counsel's failure to object to this charge on *Huffman* grounds was constitutionally deficient performance under *Strickland* is unsustainable.[11]

10. Furthermore, the Third Circuit cases provide no support for appellee's position. For example, in *Everett v. Beard,* 290 F.3d 500 (3d Cir.2002), the Court granted *habeas corpus* relief to state prisoner Gerald Everett because the first-degree murder instruction explicitly directed the jury that it could convict Everett of first-degree murder if either he or his accomplice possessed the intent to kill. The first-degree murder instruction quoted there stated that, "[a] killing is willful and deliberate if defendant and/or his accomplice, if there were any, consciously decided to kill the victim, and it is premeditated if the defendant or his accomplice, if there were any accomplices, possessed a fully informed intent to kill at the time when the killing took place...." *Id.* at 504. Like the instructions in *Huffman* and *Wayne,* the *Everett* instructions told the jury that Everett did not need to personally harbor a specific intent to kill in order to be convicted of first-degree murder; his conviction could be based on the state of mind of the principal. *See, e.g., Priester v. Vaughn,* 382 F.3d 394, 397 n. 2 (3d Cir.2004) (explaining that jury instructions in *Everett* were "patently erroneous as a matter of law"). Again, in this case, there was no such error in the jury instruction, which could lead the jury to conclude that a first-degree murder conviction could be based on anything other than appellee's state of mind.

11. As we have noted, the Commonwealth also argues that *Huffman* has been effectively overruled by this Court's subsequent cases. That may be so, as some cases and expressions have suggested. However, we

## C. *Equal Protection and Due Process*

■ Finally, we address appellee's alternative argument that it would be fundamentally unfair not to award him collateral relief in the form of a new trial when his co-defendant Wyatt was granted a new trial by the Superior Court on the same collateral claim. Appellee cites *Commonwealth v. Cruz*, 578 Pa. 263, 851 A.2d 870 (2004), in support of this position. Both the initial Superior Court *en banc* panel, in *dicta* following its jurisdictional time-bar ruling, and the PCRA court, in an alternative merits holding following remand, concluded that a new trial should be granted to appellee because of the new trial awarded to Wyatt; the panel below, however, declined to reach the claim. Since the argument was preserved by appellee in the PCRA court, and would afford a ground for affirmance if meritorious, we will reach it. We find, however, that the claim fails for multiple reasons.

■ First, appellee and Wyatt are not identically situated factually. The testimony at trial established that appellee, and not Wyatt, supplied the loaded gun that was used to effectuate the robbery and to murder Ju Yang Lee. This fact alone makes the position of the actors sufficiently distinct that it is erroneous to simply assume that the court's jury charge had the same effect on the two defendants, and that collateral relief is required here merely because relief was awarded to Wyatt. Along the same lines, the actual claim at issue is not a primary claim, such as would arise if both co-defendants had preserved identical objections to the jury charge. Rather, both defendants waived any objection and then raised derivative claims of ineffective assistance of counsel on collateral review. Hindsight evaluations of the conduct of different lawyers representing different clients facing different levels of complicity cannot be kneejerk or monolithic; appropriate review requires consideration of the circumstances as they appeared to counsel, as well as a consideration of the reasons for

need not render, or repeat, such a holding here in order to correct the more fundamental error undergirding the grant of relief, where the instructions given do not implicate the concerns giving rise to the *Huffman* decision.

counsel's trial actions, and relative assessments of *Strickland* prejudice.[12] Appellee has not attempted to account for this reality; and trial counsel was never heard from.[13]

Second, *Cruz* provides no support for appellee's position. *Cruz* involved a drug and conspiracy prosecution arising from a police search of co-defendant Patricia Melendez's home; at the time of the search, Cruz was inside the residence. Melendez and Cruz were tried together, and both were convicted. On direct appeal, the Superior Court affirmed the convictions in separate, memorandum opinions. This Court granted allowance of appeal to Cruz, but later dismissed the appeal as improvidently granted. Melendez also filed a petition for allowance of appeal, which this Court granted, and we ultimately awarded her relief, concluding that the drug evidence should have been suppressed.[14] *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996). Subsequently, Cruz filed a PCRA petition arguing, *inter alia*, that his rights of due process and equal protection were violated by alleged disparate treatment he received at the hands of this Court on direct appeal. The lower tribunals denied relief and this Court granted allowance of appeal.

12. The assessment of *Strickland* prejudice in the context of a case, such as this one, where the murder occurs during the commission of a felony and the ultimate verdict leads to a sentence of life imprisonment, is not as straightforward as might be assumed. In a capital prosecution, a strategy devoted to defeating the first-degree murder charge is obviously salutary, even if there is no realistic prospect for avoiding a verdict of second-degree murder. In non-capital cases, however—or in capital cases where counsel succeeds in avoiding a verdict of death—there is little consolation that the defendant's mandatory life term results from a second-degree murder verdict rather than one for first-degree murder. Thus, as a practical matter in cases involving murders committed during a felony, like this one, the result counsel secures can properly be faulted on *Strickland* prejudice grounds only if the course not taken offered a reasonable probability of avoiding a verdict of guilty of second-degree murder.

13. Notably, the panel in *Wyatt* awarded relief summarily, not allowing counsel to be heard from.

14. Melendez's petition for allowance of appeal was delayed because she sought reargument in the Superior Court before filing the petition in this Court.

In ruling on Cruz's PCRA claim, the Court expressly determined that Cruz and Melendez were "identically (or at least similarly enough) situated." We also determined that our decision on the *Melendez* direct appeal announced no new, controlling law. Turning to Cruz's equal protection and due process argument, we explained that differential treatment of co-defendants "is not generally actionable, and there are certainly an unlimited number of circumstances that may, in a given case, validly support differential treatment among co-defendants in their subsequent efforts to obtain relief on appellate review." *Cruz*, 851 A.2d at 877. Nevertheless, we concluded that there were insufficient reasons to support the inconsistent treatment of the codefendants in this instance. We recognized that the U.S. Supreme Court had never determined whether the commands of equal protection or due process required equal treatment of co-defendants with purely legal issues on appeal, but we ultimately declined to reach the federal constitutional issue because we granted Cruz relief via relitigation of the underlying search issue, albeit within the confines of the PCRA. Specifically, we held that the previous litigation bar of the PCRA did not function as a "never-yielding bar to the possibility of collateral relief" and granted Cruz relief under the PCRA "in the particularized circumstances presented." *Id.* at 878.

*Cruz* is distinguishable from this case on multiple grounds in addition to the lack of identicality in the circumstances of appellee and Wyatt. Cruz's co-defendant Melendez was awarded relief by this Court; not, as here, by an intermediate appellate court, in a circumstance where no further review occurred. Thus, the finding that the search in *Melendez* was unlawful was made by this Court, and we began our analysis in *Cruz* premised upon the assumption that that holding was correct and based in existing law. In contrast, this Court has never held that Wyatt was entitled to a new trial, or that the jury charge at issue was objectionable, or that counsel for any of the co-defendants was required to object to the charge. To the contrary, as our analysis above makes clear, the charge here was not improper, and counsel cannot be deemed ineffec-

tive. Thus, even if we were to assume that Wyatt and appellee were indeed identically situated factually, the injustice would consist in the Superior Court's error in granting ineffectiveness relief to Wyatt premised upon a misreading of *Huffman* and our subsequent cases.[15]

Additionally, Cruz ultimately was granted relief under an exception to the previous litigation bar of the PCRA; our opinion did not purport to credit Cruz's due process and equal protection argument, which is the essence of the argument appellee forwards here. Cruz had preserved the underlying search claim upon which he prevailed. There is no previous litigation bar at issue in this case, the avoidance of which could reinvigorate a *Huffman* objection that he never raised at trial. Instead, appellee's sole contention is that he is entitled to relief because of the relief the Superior Court granted Wyatt, citing to Cruz as if it passed upon an issue it did not pass upon, and suggesting it commands the result. *See Commonwealth v. Hackett*, 598 Pa. 350, 956 A.2d 978, 987 (2008) (noting that Court's decision to grant relief in Cruz was not based on equal protection or due process concepts). Appellee does not further develop this argument and provides no other citation to federal or state law in support of it. The argument, as stated, must fail.[16] Accordingly, appellee cannot prevail on his alternative theory.[17]

For the reasons stated above, we reverse the order of the Superior Court, granting appellee a new trial, and we remand

15. This Court's decision in *Thompson* was issued over four years before the *Wyatt* panel rendered its decision.

16. Appellee's entire argument on this point consists of the following:
Bennett and his co-defendant Kevin Wyatt were allegedly standing side-by-side during the incident. Since Wyatt was granted a new trial as a result of trial counsel's ineffective assistance of counsel for failing to object to the accomplice liability instruction, Bennett is entitled to identical relief. *Commonwealth v. Kevin Wyatt*, 782 A.2d 1061 (Pa.Super.2001) (table). *See Commonwealth v. Cruz*, 578 Pa. 263, 851 A.2d 870 (2004); *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996).
Appellee's Brief at 23–24.

17. In light of our disposition, we need not reach, and offer no view upon, the Commonwealth's second argument, concerning modification of the judgment to a verdict of guilty of second-degree murder.

to the PCRA court for the entry of an order dismissing the petition for PCRA relief.[18]

Jurisdiction relinquished.

Justices TODD and ORIE MELVIN did not participate in the consideration or decision of this case.

Justices EAKIN and BAER join the opinion.

Justice SAYLOR files a concurring opinion in which Justice McCAFFERY joins.

Justice SAYLOR, concurring.

The majority ably demonstrates that the language from the jury charge invalidated in *Commonwealth v. Huffman*, 536 Pa. 196, 198, 638 A.2d 961, 962 (1994), was, in fact, the core first-degree murder instruction—as opposed to "the trial court's instruction on accomplice liability" (which is how the *Huffman* Court mistakenly described it, *id.* at 198, 638 A.2d at 962). *See* Majority Opinion, at 576–77 n. 7, 57 A.3d at 1199–1200 n. 7. This understanding alleviates several of the conceptual difficulties which have pervaded this area of the law.

Still, it remains that our trial courts otherwise have had substantial difficulty unambiguously conveying when it is that a criminal defendant may be held liable for first-degree murder where the killing is actually perpetrated by another. In the present case, for example, the trial court issued a conspiracy charge containing the following explanations:

When two or more join in the commission of an unjustified assault which results fatally, *all are guilty* regardless of which one inflicts the mortal wounds.... [T]he one who enters into the combination but does not personally commit

18. Although the first question, as framed by the Commonwealth, limits the alleged error to a "supposedly defective accomplice liability instruction," it is clear that the Superior Court opinion spoke more broadly to both the accomplice and co-conspirator instructions. This Opinion also speaks more broadly to the vicarious liability instructions, explaining how the instructions in their entirety complied with *Huffman*.

the wrongful act *is equally responsible* for the homicide as the one who directly causes it.

\* \* \*

Such responsibility ... extend[s] even to a homicide which is the consequence of the natural and probable execution of the conspiracy *even though such homicide is not specifically contemplated by the parties.*

*Id.* at 559, 57 A.3d at 1188–89 (quoting the trial court's charge to the jury) (emphasis added). It is difficult for me to agree with the majority's conclusion that this language, even as read in context of the entire charge, "appropriately conveys that [a] ... coconspirator must possess the specific intent to kill in order to be found guilty of first-degree murder." *Id.* at 579, 57 A.3d at 1201.[1] I maintain reservations, since—by rendering a defendant who is a coconspirator as to conduct (an assault which "results" in a death) other than an intentional killing "equally responsible" with a conspirator who is the killer—I believe this charge could be taken as overriding the specific-intent requirement for first-degree murder.

Some additional complexity in these cases, I believe, lies with the underlying definition of "accomplice" or "coconspirator" provided by the trial courts. Accomplice and coconspirator liability instructions will not be facially misleading, at least, if a trial court conveys clearly enough that the accomplice must have the intent of promoting or facilitating *the relevant* crime (of concern here, first-degree murder), and the object of a conspiracy must be to kill (again, for purposes of coconspirator liability for first-degree murder). The trouble often is that, as in the present circumstances, there are other crimes (here, "murder, robbery, possession of an instrument of crime and violation of the Uniform Firearms Act") mixed into the equation. Majority Opinion, at 558, 57 A.3d at 1188 (quoting the jury charge). Thus, almost any imprecision in defining an accomplice or conspirator, or in describing the criminal culpa-

---

1. The majority's approval of this instruction is reflected, among other instances, in its remark that "the jury instructions on first-degree murder and vicarious liability [issued in the present case] were correct." Majority Opinion, at 582, 57 A.3d at 1203.

bility of such persons, can lead to an ambiguity as to whether an accomplice or conspirator in *some other crime* may be held vicariously liable for first-degree murder.[2]

In light of the constellation of problems experienced in this area of the law, it seems unsurprising that *Huffman* was at one time read by this Court to require that trial courts "must clarify for the jury that the specific intent to kill necessary for a conviction of first-degree murder must be found present in both the actual killer and the accomplice." *Commonwealth v. Chester*, 557 Pa. 358, 380 n. 12, 733 A.2d 1242, 1253 n. 12 (1999); *see also* Majority Opinion, at 579, 57 A.3d at 1201. Indeed, given this admonition, and in view of the *Huffman* Court's mistaken depiction of the defective charge before it as "the trial court's instruction on accomplice liability," I had read a number of the Court's subsequent decisions as effectively overruling *Huffman*. *See, e.g., Commonwealth v. Sepulveda*, 618 Pa. 262, 343–46, 55 A.3d 1108, 1157–58 (2012) (Saylor, J., concurring).[3] Presently, however, with the benefit of the fuller perspective on *Huffman* now offered by the majority, *see* Majority Opinion, at 576–77 n. 7, 57 A.3d at 1199–1200 n. 7, it appears that the Court has overruled only the *Chester* reading of *Huffman*.

I realize that, in light of the many previous occasions in which *Huffman* questions have been addressed in divided opinions of this Court, the majority opinion here reflects the prevailing view to which I am bound (*i.e.*, that a trial court's

---

**2.** Other variations of instructions yielding a degree or ambiguity occur where trial courts: refer to "a crime" or "any crime" in the course of accomplice or conspiratorial liability instructions (instead of consistently referring to "the crime" for which such liability is under consideration), *cf., e.g., Commonwealth v. Flanagan*, 578 Pa. 587, 594, 607–09, 854 A.2d 489, 493, 501–02 (2004) (reflecting this Court's disapproval of a defective guilty-plea colloquy along such lines); or blend a concept of "aiding" in the crime (without explicitly expressing an intent element) into the accomplice definition. Again, such formulations would appear to broaden the definition of accomplice beyond one with a shared specific intent to kill (where the relevant crime is first-degree murder).

**3.** *See also Commonwealth v. Daniels*, 600 Pa. 1, 44–45, 963 A.2d 409, 435–36 (2009) (Saylor, J., concurring); *Commonwealth v. Jones*, 590 Pa. 202, 250, 912 A.2d 268, 297 (2006) (Saylor, J. concurring) ("[A]fter Cox, it seems to me that the only surviving vestige of *Huffman* is that which remains to be litigated in the federal courts under due process theory." (citing *Laird v. Horn*, 414 F.3d 419, 425–28 (3d Cir.2005))).

reference to "the defendant" in a jury charge delineating the requirement of specific intent to kill to support a first-degree-murder conviction ameliorates potential ambiguities which might otherwise arise out of accomplice or coconspirator liability instructions). *Accord Sepulveda,* 618 Pa. at 343–46, 55 A.3d at 1157–58 (Saylor, J., concurring). Nevertheless, I remain of the view that the best way to assure consistently accurate instructions is to require that juries in first-degree murder cases to be told, specifically, that specific intent to kill is required to convict a defendant of first-degree murder under any theory. In other words, consistent with the Pennsylvania Suggested Standard Criminal Jury Instructions, *see* Majority Opinion, at 580 n. 9, 57 A.3d at 1201 n. 9, the admonition envisioned by the *Chester* Court should be given, covering both accomplice and conspiratorial liability. *Accord Sepulveda,* 618 Pa. at 343–46, 55 A.3d at 1157–58 (Saylor, J., concurring).

I also have some difficulty in the present case, with the degree to which the majority relies on the fact that Appellant's trial predated *Huffman* in its assessment of trial counsel's stewardship. *See, e.g.,* Majority Opinion, at 577–80, 57 A.3d at 1200–01. To the extent the majority opinion suggests that ineffectiveness is measured against whether or not there is a controlling case directly on point to guide an attorney's decision-making, I note that this Court previously has expressly rejected such position. *See Hughes,* 581 Pa. 274, 331–32 & n. 6, 865 A.2d 761, 795–96 & n. 36 (2004). Moreover, it seems apparent to me, at least, that counsel in a murder case in 1992—in which his client indisputably did not perpetrate the actual killing—should have been sensitive to the need for the trial court to make clear to the jurors that specific intent to kill was required to support a conviction of first-degree murder under any theory of criminal liability. The *Huffman* Court derived as much from the pre-existing law, *see* Majority Opinion, at 571–75, 57 A.3d at 1196–98, and I do not see why the same should not be true for other cases presenting other potentially misleading variants of these essential jury instructions.

Finally, although I have difficulty with the jury instructions given here, ultimately, I support the result directed by the

majority based on the prejudice criterion of the ineffectiveness inquiry. Under Appellant's most favorable argument, substantively, the jury may have actually found him guilty of second- instead of first-degree murder based on an erroneous understanding of the specific-intent requirement attaching to the latter. The fact that the penalty (*i.e.*, life imprisonment) is the same for Appellant in either event ameliorates the prejudice to a substantial degree, *accord Commonwealth v. Bennett*, 593 Pa. 382, 409, 930 A.2d 1264, 1280 (2007) (Saylor, J., dissenting), even if the trial court's instructions were not consistent with the law as it is now understood, since the *Chester* reading of *Huffman* has been effectively overruled.

Justice McCAFFERY joins this Concurring Opinion.