J-S42043-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                       :          PENNSYLVANIA
                                         :
             v.                                :
                                         :
                                         :
SHAVONE ARMSTRONG                  :
                                         :
           Appellant                    :     No. 2013 EDA 2018

Appeal from the Judgment of Sentence Entered February 26, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011385-2016

BEFORE:   OTT, J., KUNSELMAN, J., and COLINS*, J.

MEMORANDUM BY COLINS, J.:              **FILED NOVEMBER 25, 2019**

Appellant, Shavone Armstrong, appeals from the aggregate judgment of sentence of life without the possibility of parole. The sentence was imposed on February 26, 2018, by the Honorable Glenn B. Bronson after Appellant was convicted of First Degree Murder, Conspiracy to commit First Degree Murder, Robbery, Kidnapping, Unlawful Restraint, and Possession of an Instrument of Crime (PIC) for the murder of Toy Bryant.[1,2] Appellant is challenging the

_____

[1] 18 Pa.C.S. §§ 2502(a), 903, 3701(a)(1), 2901, 2902(a)(1), and 907, respectively.

[2] We note that Appellant was charged with one count of Conspiracy, with the criminal objective noted as "murder/robbery/kidnapping." On the jury verdict sheet, three separate conspiracy charges were listed: "conspiracy to murder, conspiracy to kidnap and conspiracy to robbery," and the jury listed "guilty" next to each charge. Appellant's sentencing Order indicates that Appellant was sentenced for "conspiracy to commit kidnapping" and was not sentenced for "kidnapping." However, a review of the sentencing transcripts shows that

_____

\*   Retired Senior Judge assigned to the Superior Court.

sufficiency of the evidence for her conviction of first degree murder and the weight of the evidence. We affirm.

Appellant's conviction arises out the murder of Toy Bryant (victim). Appellant was arrested and charged with First Degree Murder, Conspiracy, Robbery, Kidnapping, Unlawful Restraint and PIC. Appellant proceeded to a jury trial. Appellant's co-conspirators, Ms. Shintele Smith (Ms. Smith) and Mr. Keith Bullock (Mr. Bullock) were not co-defendants at Appellant's trial. At trial, the Commonwealth called the following witnesses. Ms. Moten, the victim's sister, testified to events leading up to her sister's murder. Ms. Danielle Raymond, Appellant's cousin, neighbor to the victim and friend/acquaintance of Ms. Smith, testified to events leading up to Ms. Bryant's murder and to statements made by Appellant and Ms. Smith before and after the murder. Mr. Bullock, one of Appellant's co-conspirators, testified to events surrounding the murder. Detective Cento testified to the interview that he conducted with Danielle Raymond. The first responding police personnel, Crime Scene Unit personnel, and a Medical Examiner, testified about the

the trial court stated "there's three conspiracies listed here [on the jury verdict sheet], but only one conspiracy charge. So that will just be conspiracy to commit murder I will sentence on." N.T. 2/26/18 at 31. Additionally, as to the charge of "kidnapping" the trial court sentenced Appellant to "three and a half to 20 years" incarceration. *Id.* at 41. It is clearly a clerical error that Appellant's sentencing Order states that Appellant was sentenced for "conspiracy to commit kidnapping" and not sentenced for "kidnapping." We therefore, request that the trial court correct its judgment of sentence Order to reflect that Appellant was sentenced for "kidnapping" and not "conspiracy to kidnap." The trial court has inherent power to correct obvious mistakes in its order. *Commonwealth v. Holmes*, 933 A.2d 57, 65 (Pa. 2007).

- 2 -

location where the victim's body was found and described her body and injuries. Detectives Lucke and Dunlap, experts in cell phone extraction analysis and historical cell site analysis, respectively, testified to the phone records between Appellant, Ms. Smith, Mr. Bullock and the victim and the approximate location of their phones during the time of the murder.

The facts underlying this appeal are as follows. At approximately 8:00 a.m. on June 14, 2016, the victim's body was found in a "dark" and "desolate" location in Fairmount Park. Notes of Testimony (N.T.) 2/21/18 at 30. The victim's body was discovered lying face down, her hands were on the back of her head and were handcuffed together with "real handcuffs." *Id.* at 149. The victim's body was located 176 feet from the "dark" roadway inside Fairmount Park, on the edge of the tree line, in the overgrown brush. *Id.* at 44, 146. The victim died from a single gunshot wound to the back of her head. N.T. 2/22/18 at 192-193. The victim's body also suffered a stab wound to her upper left back, slice marks on her back and earlobe, deep scrapes on her elbows, and bruises on her arms, feet and wrists. *Id.* at 179-186. The victim had a latex glove shoved down her throat. N.T. 2/21/18 at 156-157. The victim had no identification or cell phone on her person. *Id.* at 147.

The Commonwealth presented evidence that homicide detectives obtained information that led them to Ms. Raymond's apartment on June 16, 2016. N.T. 2/22/18 at 26-27. Appellant was present at Ms. Raymond's apartment. *Id.* Ms. Raymond agreed to accompany the detectives to the

homicide unit to discuss the victim's murder. *Id.* Appellant also agreed to go with Ms. Raymond. *Id.* at 27-28. Appellant and Ms. Raymond were transported in separate vehicles. *Id.* During the car ride, Ms. Raymond told Detective Burke that Appellant and Ms. Smith told her "they killed [the victim] . . . and that the reason for the murder was that [the victim] had stolen approximately $8,500 from [Ms.] Smith."[3] *Id.* at 33. Upon arrival at the police station, Appellant was searched and a handcuff key fell out of her hairstyle. N.T. 2/21/18 at 270. This key opened the handcuffs that bound the victim's hands. N.T. 2/22/18 at 83.

Ms. Raymond gave a statement to homicide Detectives on June 20, 2016. The Commonwealth introduced Ms. Raymond's statement as substantive evidence through Detective Joseph Cento. Detective Cento testified that when asked to describe in her own words how and what she knew about the victim's death, Ms. Raymond responded, "I know because [Ms. Smith] told me what happened. [Ms. Smith] said that she took a trip with [the victim] to Pittsburgh, along with [Appellant]. They went to meet and rob [Ms. Smith's] white guy slash sugar daddy. [The victim] and [Appellant] never

---

[3] This statement was not admitted as substantive evidence of Appellant's guilt; it was admitted as a prior inconsistent statement of Danielle Raymond, as Ms. Raymond attempted to repudiate several statements she made to Detectives at trial. The Commonwealth was permitted to introduce this statement that Ms. Raymond made to Detective Burke, which was incorporated into the "activity sheet" of the investigation, in order to allow the jury to evaluate the truthfulness of Ms. Raymond's in-court testimony.

met the guy before, as far as my knowledge. The girls were supposed to take the guy's TVs and cars, and the cars were supposed to go to a chop shop." N.T. 2/22/18 at 12. The following exchange between Ms. Raymond and Detective Joseph Cento was introduced at trial:

Detective Cento: Did [Ms. Smith] tell you what happened in Pittsburgh and what happened to Toy?

Danielle Raymond: [Ms. Smith] said that they got money from the white guy. She said it was $8,500 and then they was coming back, and when they got back to the last rest stop, [the victim] took the bag with the money out of the car and gave it to her ex-boyfriend Marcus.

Detective Cento: How did [Ms. Smith] know that she gave the bag with the money to Marcus?

Danielle Raymond: [The victim] admitted to it. She said that [the victim] said that she was high and that she gave the money to somebody, but didn't remember who it was. There was a fight between [the victim] and [Ms. Smith], I'm assuming in Philadelphia somewhere. [The victim] and [Appellant] started fighting too. [Ms. Smith] wanted to handcuff and put [the victim] into the trunk of the car, but they just put her in the backseat.

Detective Cento: Did they spend time looking for who [the victim] gave the money to?

Danielle Raymond: I don't know. [The victim] kept saying that she didn't know.

Detective Cento: Was [Ms. Smith] mad at [the victim] for the missing money?

Danielle Raymond: Yes.

Detective Cento: Do you know how [the victim] wound up in Fairmount Park?

Danielle Raymond: Yes. Before it even hit the news, [Ms. Smith] told me that she stabbed her and went like this. (Indicating poking motion at the waist.) [Appellant] was there and was shaking her head yes. Then she said that she walked her down there and she pistol whipped her and shot her in the back of the head."

- 5 -

Detective Cento: [Ms. Smith] said that she was the one that pistol whipped [the victim] and shot her?

Danielle Raymond: Yes.

Detective Cento: What part did [Appellant] have in the incident?

Danielle Raymond: She just beat her up. [Appellant] took [the victim], and she slammed her down a few times.

Detective Cento: Did [Appellant] tell you that she did anything else to [the victim]?

Danielle Raymond: She said at first that she didn't put the cuffs on her, but then she did tell me that she was the one who handcuffed [the victim].

*Id.* at 12-15. Ms. Raymond testified that on June 20, 2016 she gave a statement to the detectives that on June 17, 2016, she found a fold up knife in her couch cushion. N.T. 2/21/18 at 221. Ms. Raymond also testified she told detectives she found Appellant's wallet or clutch purse "stuck down in the seat cushion too, with the knife." *Id.* Ms. Raymond testified that when asked, in her interview, if she knew who the knife belonged to, Ms. Raymond answered "[n]o, but it only could have come from [Appellant]. That's right where she was sitting when the detectives came into the house." *Id.* at 223.

In addition to Ms. Raymond's testimony, the Commonwealth presented the testimony of Mr. Bullock, co-conspirator to the murder of the victim. Mr. Bullock testified that Ms. Smith was his girlfriend back in June 2016. N.T. 2/22/18 at 52. He knew Appellant as a friend of Ms. Smith. *Id.* at 53. Mr. Bullock testified that Appellant, Ms. Smith and the victim were all present at Ms. Smith's house at 2613 Bialy Street on June 13, 2016 around 7:00 p.m.

until approximately 10:00 p.m. *Id.* at 57. Mr. Bullock testified that the victim and Appellant left together around 10:00 p.m. *Id.* at 59. Ms. Smith left the house after 10:00 p.m. *Id.* at 59. Mr. Bullock testified that around 1:00, 1:30 a.m. [on June 14, 2016] Ms. Smith called him and asked him to "take a ride with her somewhere to go pick up some money," and "she did say that she was owed some money from [the victim]." *Id.* at 60-61. Ms. Smith arrived at Bialy Street approximately 15 or 20 minutes later, she was driving a gray Nissan and the victim was in the passenger seat. *Id.* at 61-63. Ms. Smith told Mr. Bullock that they were going to pick up the Appellant around the block. *Id.* at 64. Mr. Bullock got into the driver's seat, Ms. Smith was sitting behind him, the victim was in the passenger seat and Appellant got into the back passenger seat. *Id.* at 64-65. He testified, "[Appellant] was telling me which way to go," "she was giving me directions on where to go" for about "15, 20 minute[s]". *Id.* at 67-68. He testified that once they got close to the destination Appellant "put handcuffs on" the victim. *Id.* at 69. Appellant "made [the victim] put her hands [behind her head] and then she put the handcuffs on her." *Id.* Appellant said to "put your hands behind . . . the headrest." *Id.* When they arrived at their destination in Fairmount Park, Mr. Bullock turned the car lights off. *Id.* at 72. "[Ms. Smith] pulled [the victim] out of the car after [Appellant] uncuffed her." *Id.* at 73. [Ms. Smith] took one cuff off and [Ms. Smith] kind of picked her up and got her out of the car. *Id.* at 74. Then he saw [Ms. Smith] put the cuffs back on her and then they

[Appellant, Ms. Smith, and the victim] went off in the dark. *Id.* They were gone for five to ten minutes. *Id.* at 76. He heard a gunshot. *Id.* at 77. Appellant and [Ms. Smith] came running back to the car and he pulled off. *Id.* at 77. Appellant started giving him directions to get back to Bialy Street. *Id.* at 78.

Additionally, the Commonwealth presented testimony from the victim's sister, Ms. Tynesha Moten. Ms. Moten testified that on June 14, 2016, at approximately 12:20 a.m., the victim knocked on her bedroom door. N.T. 2/21/18 at 10-11. Ms. Moten and the victim lived together at that location in Chester, PA; Ms. Moten was not expecting her sister home. *Id.* The victim looked scared and asked Ms. Moten for two hundred dollars. *Id.* at 11-12. When Ms. Moten told the victim she did not have the money, the victim asked her again, "she was kind of, like, whispering did I have the $200. She didn't look normal." *Id.* at 13. Ms. Moten then saw Ms. Smith coming up the stairs to her apartment. *Id.* at 12. Ms. Smith told Ms. Moten that the victim stole $8,000.00 from her. *Id.* at 13. When Ms. Moten told Ms. Smith and the victim they had to leave, "[Ms. Smith], she roughed [the victim] up by the back of her shirt and tried to force her out the door." *Id.* at 14. "[Ms. Smith] grabbed the back of her shirt and tried to push her out the door." *Id.* The victim "tried to stay in the house," "[s]he didn't want to leave." *Id.* at 15. The victim "told me that she loved me." N.T. 2/21/18 at 15. Ms. Smith "forced her out

- 8 -

the door," "physically pushed her out the door." *Id.* 15-16. Ms. Moten never saw her sister again. *Id.* at 16.

The Commonwealth presented cell phone records and cell tower data depicting the communication between and the approximate location of the cell phones belonging to Appellant, Ms. Smith, the victim, and Mr. Bullock between June 12, 2016 and June 16, 2016. Detective Thorsten Lucke testified as an expert in cell phone extraction analysis. Detective Lucke obtained the phone call and text message logs from the four cell phones belonging to Appellant, the victim, Ms. Smith and Mr. Bullock. Detective Lucke testified that Appellant called Ms. Smith on June 14, 2016 at 12:08 a.m., and the phone call lasted for 7 minutes and 41 seconds. N.T. 2/22/18 at 107. At 12:55 a.m. Appellant received a call from Ms. Smith that lasted 4 minutes and 20 seconds. *Id.* at 108. At 12:59 a.m., Appellant placed a call to Mr. Bullock that lasted 42 seconds. *Id.* at 116. At 1:00 a.m., Appellant placed another call to Mr. Bullock that lasted 26 seconds. *Id.* At 1:02 a.m., Appellant called Mr. Bullock, and that call lasted 49 seconds. *Id.* At 1:03 a.m., Appellant placed a call to Ms. Smith that lasted 7 seconds. *Id.* at 108. At 1:03 a.m., Appellant placed a call to Mr. Bullock that lasted 2 seconds. *Id.* at 116. Almost immediately, Appellant placed another call to Ms. Smith that lasted 1 minute and 20 seconds. *Id.* at 108-109. At 1:04 a.m., Appellant placed a call to Mr. Bullock that lasted for 52 seconds. *Id.* at 116. At 1:04 a.m., Appellant placed a call to Ms. Smith that lasted for 2 minutes and 41 seconds. *Id.* at 109. At 1:07

a.m., Appellant placed an outgoing call to Mr. Bullock that lasted for 1 minute and 19 seconds. *Id.* at 116. At 1:08 a.m., Appellant placed a call to Ms. Smith that lasted for 37 seconds. *Id.* at 109. At 1:09 a.m., Appellant placed a call to Mr. Bullock that lasted for 8 minutes and 37 seconds. *Id.* at 116. At 1:11 a.m., Appellant placed an outgoing call to Ms. Smith that lasted for 6 minutes and 25 seconds. *Id.* at 109. Finally, at 1:25 a.m. Appellant placed a call to Ms. Smith that lasted for 1 minute and 45 seconds. *Id.*

Detective James Dunlap testified as an expert in historical cell site analysis. Through evidence obtained from their cell phones, Detective Dunlap testified that Appellant, Ms. Smith and the victim arrived in Pittsburgh around 1:00 am on June 12, 2016. N.T. 2/22/18 at 154-154. All three women used the cell towers in Pittsburgh for about 24 hours, until June 13, 2016 at 1:00 a.m. *Id.* The cell phone tower evidence put all three women on the path from Pittsburgh back to Philadelphia on June 13, 2016. *Id.* at 155. All three women used their phones in the State College area between 8:45 a.m. and 9:09 a.m. on June 13, 2016. *Id.* The last call for Appellant before she got to Philadelphia is at 1:04 p.m. on June 13, 2016. *Id.* at 156.

Detective Dunlap testified that the victim's phone was in the general geographical area surrounding 2613 Bialy Street, Ms. Smith's house, from 7:10 p.m. until 10:23 p.m. on June 13, 2016. *Id.* at 157. Detective Dunlap testified that 10:23 p.m. on June 13, 2016 was the last time the network was able to connect with the victim's phone. *Id.* at 159. He testified that means

that at 10:23 p.m. the victim's phone was either dead, the battery pulled out or the phone was turned off. N.T. 2/22/18 at 153-158. Detective Dunlap testified that neither Appellant, Ms. Smith or Mr. Bullock tried to call or connect with the victim's phone after 10:23 p.m. on June 13, 2016. *Id.* at 159. Detective Dunlap testified that all the calls received on the victim's phone after 10:23 p.m. went to voicemail or were not connected. *Id.* at 158-159.

Detective Dunlap testified that during the period of 9:55 p.m. and 10:26 p.m. on June 13, 2016, Appellant's phone was moving around in a three square mile area in Southwest Philadelphia, in the same area where Ms. Smith's house is located. *Id.* at 160. Detective Dunlap testified that Ms. Smith's phone was in the Southwest Philadelphia area close to her house between 5:42 p.m. and 11:50 p.m. on June 13, 2016. *Id.* at 162. Detective Dunlap testified that Mr. Bullock's phone had 18 network activities between 6:17 p.m. on June 13, 2016 and 1:11 a.m. on June 14, 2016, using two towers that cover the address of 2613 Bialy Street, Ms. Smith's house. *Id.* at 163. Detective Dunlap testified that all four phones belonging to Appellant, the victim, Ms. Smith, and Mr. Bullock "in that time frame are in that Southwest Philadelphia area." *Id.* at 163.

Additionally, Detective Dunlap testified that Ms. Smith's phone used cell phone towers in the Chester area, the location of the victim's sister's house, between 12:41 a.m. and 12:49 a.m. on June 14, 2016. *Id.* at 164. Detective Dunlap testified that Ms. Smith's phone then used cell towers that

demonstrated her phone went back to Philadelphia, specifically, to the Bialy Street area where her house is located, at 1:25 a.m. *Id.* Detective Dunlap testified that at 1:39 a.m. Ms. Smith's phone was moving, and at 2:00 a.m. and at 2:21 a.m. her phone used a tower below [Fairmount] park. *Id.* at 165. Detective Dunlap testified that Appellant's phone, between 1:33 a.m. and 2:18 a.m. on June 14, 2016, was moving north, and was using the tower in the area of [Fairmount] park from 1:53 a.m. and 2:18 a.m. *Id.* at 166. Detective Dunlap testified that Appellant's phone had calls at 1:59 a.m., and then there was a break until 2:18 a.m. . . . then there was a call at 2:20 a.m. and then a break to 3:05 a.m. *Id.* at 167-168. Detective Dunlap testified that there was no activity on Mr. Bullock's phone between 1:17 a.m. and 8:32 a.m. on June 14, 2016. *Id.* at 165.

The Commonwealth presented testimony from Sergeant James Russell, the first police personnel to arrive on the scene. At approximately 8:30 a.m. on June 14, 2016, Sgt. Russell testified that he received a radio assignment for "a woman down" at 5300 Georges Hill, inside Fairmount Park, directly behind the Mann Music Center. *Id.* at 25-28. Sgt. Russell testified that the spot Ms. Bryant's body was found was in "an area I frequent," "it's a desolate area," "not very well-lit" and "very poor lighting." *Id.* at 30. He described the location Ms. Bryant's body was found as "picnic area No. 1 . . . an open air picnic area covered by a roof." *Id.* at 31. Sgt. Russell agreed that a more accurate description of the area is a pavilion. *Id.* "In the four years I've been

- 12 -

there, I've never seen any lights in the area." *Id.* at 30-31. Sgt. Russell indicated that he has had the opportunity to go to that area at night and testified he cannot see anything at night and "[y]ou need spotlights or direct lighting." *Id.* at 31-32. "I enter [Fairmount Park] from 52nd street . . . there's a small path . . . once you drive past this path, there's no lighting [in the area where the victim's body was found] . . . even though there's a light pole . . . in the four years I've been there [the lights underneath the pavilion] never worked. So it's very dark. . . . I'll shed my spotlight of my vehicle . . . in this area to see if there's anyone back there." *Id.* at 44. Sgt. Russell was asked, "are you able to see into the tree line at all [where the victim's body was found]?" and he testified, "[n]o, I can't." Sgt. Russell testified that "[i]t's very difficult to see if anything would be in [the picnic area] without the aid of a light." *Id.* at 45. Sgt. Russell testified Ms. Bryant's body was located approximately 40-50 yards from Georges Hill Rd., the only access road to the location. *Id.* at 29, 39. He observed "on the left side [of the body] a large pool of blood or large area where blood was, some scratches on the back of the neck, and what I believe to be a puncture wound to the back of the neck and head." *Id.* at 41.

Crime Scene Unit Officer Michael Maresca testified that the victim's body was discovered "toward the brush line, the overgrown grass," 176 feet from the Georges Road and 92 feet from the pavilion. N.T. 2/21/18 at 145-146. Officer Maresca testified that "we actually did a complete search of that area

to the highway line. About another 100 yards . . . into the overgrown bushes, we walked back in there." *Id.* at 147.

The Commonwealth and defense stipulated that "if Michelle Jones was was called to testify, she would testify that on Thursday, January 5, 2017, she got into an argument with the [Appellant]. And the [Appellant] said, 'I can't wait to see you bitches in the street. Another body don't mean shit to me.' " N.T. 2/22/18 at 203.

Appellant proceeded to a jury trial and was found guilty of first degree murder, robbery, kidnapping, unlawful restraint, PIC, and conspiracy. Appellant filed a timely post-sentence motion on March 7, 2018.[4] On June 21, 2018, the trial court denied her post-sentence motion. On July 16, 2018, Appellant filed this timely direct appeal.[5] Appellant presents the following issue(s) for our review:

1. Whether the adjudication of guilt for First Degree Murder is based upon insufficient evidence where the Appellant did not shoot the decedent, where there is no proof that the Appellant stabbed the decedent, where the recovered knife was not linked forensically to the stab wounds, where there was no proof that the Appellant knew that Shintele Smith was armed with a gun and where the evidence that she intended to kill was derived solely from speculation conjecture and guess?

2. Whether the adjudication of guilt is against the weight of the evidence and shocking to one's sense of justice where there

---

[4] Appellant's post sentence motion included a challenge to the weight of the evidence. Appellant's Post Sentence Motion, 3/7/2018 at ¶ 3.

[5] Appellant filed her timely statement of errors complained of on appeal on July 27, 2018. The trial court entered its opinion on October 15, 2018.

was no specific physical evidence linking Appellant to the crimes, where the cooperating co-defendant was a corrupt and polluted source who had lied on previous occasions to the police, where the cell phone evidence proved unequivocally that the cooperating witness had lied to the jury about material facts, where Danielle Raymond's testimony about what the Appellant had admitted to was confused and confusing and where the police had failed to locate the victim's boyfriend Marcus to corroborate the Commonwealth's theory of motive?

Appellant's Brief at 6 (reordered for ease of discussion).

### Sufficiency of the Evidence for First Degree Murder

Appellant first challenges the sufficiency of the evidence to establish her conviction for First Degree Murder. *Id.* at 24. This Court's standard for reviewing sufficiency of the evidence claims is as follows:

> Whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt my means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Fortson*, 165 A.3d 10, 14–15 (Pa. Super. 2017) (citation and internal brackets omitted) (some formatting), *appeal denied*, 174 A.3d 558 (Pa. 2017). "The task of an appellate court in reviewing the sufficiency

claim is to determine whether, accepting as true all the evidence and all reasonable inferences therefrom, upon which, if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the accused is guilty of the crime or crimes of which he has been convicted. *Commonwealth v. Craig*, 370 A.2d 317, 320–21 (Pa. 1977). If the factfinder reasonably could have determined from the evidence adduced that all of the necessary elements of the crime were established, than that evidence will be deemed sufficient to support the verdict. *Commonwealth v. Wood*, 637 A.2d 1335, 1343 (Pa. Super. 1994).

Appellant argues that the evidence is insufficient to prove beyond a reasonable doubt that she possessed the specific intent to kill the victim. Appellant's brief at 25.

> While this writer must concede that giving the Commonwealth the benefit of all reasonable inferences to be drawn from the evidence there is sufficient evidence to conclude that Appellant participated in the Kidnapping and other related offenses, it is in no way conceded that sufficient evidence existed to convict the Appellant of First Degree Murder. Given that there are no admissions made to [Ms.] Raymond that Appellant agreed to kill [the victim], that there is no evidence that the Appellant knew that [Ms.] Smith was armed with a hand gun, that [Mr.] Bullock never testified that he overheard any discussion between [Ms.] Smith and Appellant about killing [the victim] and that [Ms.] Smith admitted to stabbing and shooting [the victim], it is just speculation, conjecture and guess that the Appellant intended to kill [the victim]. Because the evidence presented at trial was not strong enough to prove beyond a reasonable doubt that the Appellant shared the intent to kill belonging to [Ms.] Smith and [Ms.] Smith alone, the Appellant's conviction for Frist Degree Murder should be reversed.

*Id.*

- 16 -

A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing. 18 Pa.C.S. § 2502. Intentional killing is defined as "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." *Id.* To establish the offense of first-degree murder, the Commonwealth must prove, (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. *Commonwealth v. Padilla*, 80 A.3d 1238, 1244 (Pa. 2013). For first degree murder, a killing is with malice if the perpetrator acts with an intent to kill; "it is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder." *Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000).

Appellant is only challenging the element of specific intent to kill for first degree murder, and we will focus our analysis on that element only. "Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body." *See Commonwealth v. Padilla*, 80 A.3d 1238, 1244 (Pa. 2013). Where the accused did not deliver the deadly blow, the Commonwealth must prove that an accomplice or co-conspirator had the specific intent to kill the victim and cannot rely on the specific intent of the person who delivered the fatal blow.

> [T]he jury may convict the defendant as an accomplice so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote

- 17 -

or facilitate the offense.[8]  The amount of aid "need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime." However, simply knowing about the crime or being present at the scene is not enough.

> [8] Thus, relative to accomplice liability for first-degree murder, the Commonwealth must prove that the defendant harbored a specific intent to kill; it is not sufficient to prove that the defendant was an accomplice to homicide generally, and that the principal had the requisite intent.

*Commonwealth v. Markman*, 916 A.2d 586, 597–98 (Pa. 2007) (internal citations omitted).  "To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one *which the accomplice harbored and cannot depend upon proof of the intent to kill only in the principal*."  *Commonwealth v. Bennett*, 57 A.3d 1185, 1197 (Pa. 2012) (internal quotation marks omitted).

Additionally, the Pennsylvania Supreme Court clarified the general rule that each member of a conspiracy to commit murder can be convicted of murder of the first degree, regardless of who inflicted the fatal wound.

> [S]imple application of the co-conspirator rule to cases of first degree murder would alleviate the Commonwealth's burden of proving an essential element of the crime. If the general rule of co-conspirator liability applied to eliminate the need to establish the existence of specific intent, then an accused conspirator could be culpable for first degree murder without proof that the accused shared the *specific intent to kill,* the element which distinguishes first degree murder from all other forms of homicide. Such a result was clearly not contemplated by the legislature when it delineated the elements distinguishing the various degrees of homicide. *See* 18 Pa.C.S. §§ 2502(a) and (b).  . . . To be guilty of first degree

murder, each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder-*the specific intent to kill.*

**Commonwealth v. Wayne**, 720 A.2d 456, 464 (Pa. 1998). The Pennsylvania Supreme Court additionally illuminated,

> In reconciling the conflict between conspiratorial liability and the specific intent requirement of first-degree murder presented in **Wayne**, this Court concluded that a pure application of the principles of conspiratorial liability to the crime of first-degree murder would improperly relieve the Commonwealth of its burden of proving that the defendant personally maintained the specific intent to kill. . . . [T]his Court concluded that, because of the seriousness of the penalty involved, the specific intent element of first-degree murder should be elevated above principles of conspiratorial liability.

**Simpson**, 754 A.2d at 1274. Our Supreme Court clarified, "[t]o allow a conviction for first degree murder to stand without proof beyond a reasonable doubt establishing that the accused actually harbored the specific intent to kill, would be unconscionable. **Wayne**, 720 A.2d 456, 464 (Pa. 1998).

In reviewing the sufficiency of the evidence, this Court is not sitting as the jury, reweighing the evidence or judging the credibility of the witnesses. The jury heard the evidence presented at trial, the jury weighed and judged the credibility of the witnesses and the jury returned a verdict. In reviewing the sufficiency of the evidence for first degree murder, the role of the appellate court is to review the whole record, in the light most favorable to the Commonwealth, to determine if the inferences suggested by the Commonwealth are reasonable to permit the jury to find that the Appellant possessed the specific intent to kill the victim. When we review evidence in a

light most favorable to the Commonwealth, we are not obliged to outright ignore undisputed evidence so as to strengthen the reasonableness of inferences we draw from the remaining evidence. *See Commonwealth v. Predmore*, 199 A.3d 925, 934 (Pa. Super. 2018), *appeal denied*, 208 A.3d 459 (Pa. 2019). Instead, we review all of the evidence, and ascertain whether certain inferences suggested by the Commonwealth are reasonable; that is, whether it is reasonable to permit a jury to conclude that Appellant possessed the specific intent to kill the victim in the circumstances of this case. *Id.*

Where the accused did not deliver the deadly blow, circumstantial evidence can be used to show that the accused possessed the specific intent to kill the victim. The Commonwealth can prove the specific intent to kill from circumstantial evidence. *Simpson*, 754 A.2d at 1269.

> The trier of fact found that the defendant had the requisite mental state to convict of murder of the first degree and other charges. Such resolution of factual issues is solely within the province of the jury and an appellate court will not disturb the jury's findings when there is support in the record for the verdict. The existence of a shared criminal intent between the principal and his accomplice may be inferred from the circumstances or acts of the slayer and accomplice committed shortly after the slaying.

*Commonwealth v. Bachert*, 453 A.2d 931, 935 (Pa. 1982). When a court is reviewing a sufficiency of evidence claim, "[b]oth direct and circumstantial evidence must be considered equally." *Commonwealth v. Carson*, 592 A.2d 1318, 1320 (Pa. Super. 1991). We have held that a specific intent to kill can be inferred from the circumstances surrounding an unlawful killing. *Commonwealth v. Robertson*, 874 A.2d 1200, 1207 (Pa. Super. 2005).

Moreover, the necessary element of intent may be inferred from the circumstances even though direct evidence thereof is lacking. *See Commonwealth v. Cross*, 331 A.2d 813, 814 (Pa. Super. 1974).

The evidence showed that Appellant and Ms. Smith shared the same motive to kill the victim; the three women participated in a robbery and the victim stole the proceeds of that robbery. The evidence showed that Appellant and Ms. Smith both fought with the victim. Appellant was with the victim and Ms. Smith after returning to Philadelphia from 7:00 p.m. until approximately 10:00 p.m. in the hours before the victim was murdered. Appellant was in communication with Ms. Smith before Ms. Smith and the victim arrived at the victim's house at 12:20 a.m. Appellant made 13 phone calls to Ms. Smith and Mr. Bullock between 12:59 a.m. and 1:25 a.m. The Commonwealth demonstrated that Appellant provided the handcuffs to incapacitate the victim, gave the directions to the dark and desolate location of the murder, handcuffed the victim as they got close to the location of the murder, and assisted in taking the handcuffed victim into the dark location at 2:00 in the morning where, after approximately 5-10 minutes, the victim was ultimately shot in the back of her head, all circumstantial evidence of Appellant's specific intent to kill the victim.

The Commonwealth, therefore, presented direct evidence that Appellant had a motive to kill the victim, and provided circumstantial evidence of Appellant's specific intent to kill the victim. Additionally, when deciding

- 21 -

whether a defendant had the specific intent to kill, a court should consider all of the evidence regarding the defendant's and his co-conspirators' words and conduct and the attending circumstances that may show the defendant's state of mind at the time of the killing. ***Commonwealth v. Hannibal***, 753 A.2d 1265, 1270–71 (Pa. 2000). The jury could reasonably infer consciousness of guilt from the fact that the Appellant hid the handcuff key in her hairstyle, hid a knife down the couch cushion in her cousin's house, and threatened Michelle Jones that "another body don't mean shit to me." ***See Commonwealth v. Ward,*** 188 A.3d 1301, *quoting* ***Commonwealth v. Paddy***, 800 A.2d 294, 319 (Pa. 2002) ("[A]ttempts by a defendant to suppress evidence are admissible to demonstrate his or her consciousness of guilt").

Accepting as true all the evidence and all reasonable inferences therefrom, upon which, if believed, the jury could properly have based its verdict, we find the evidence sufficient in law to prove beyond a reasonable doubt that the Appellant had the specific intent to kill the victim. ***See Craig***, 370 A.2d at 320–21. Based on the foregoing, Appellant is not entitled to relief.

### Weight of the evidence

Next, Appellant contends that the "adjudication of guilt is against the weight of the evidence and shocking to one's sense of justice." Appellant's Brief at 6. A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict, but questions the evidence that the jury chose to believe. ***Commonwealth v. Thompson***, 106 A.3d 742, 758 (Pa.

Super. 2014). For that reason, the trial court need not view the evidence in the light most favorable to the verdict winner, and may instead use its discretion in concluding whether the verdict was against the weight of the evidence. *Commonwealth v. Widmer*, 744 A.2d 745, 751 n.3 (Pa. 2000). Appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this court does not review the underlying question of whether the verdict is against the weight of the evidence. *See Commonwealth v. Talbert*, 129 A.3d 536, 545-46 (Pa. Super. 2015).

> A reversal of a verdict is not necessary unless it is so contrary to the evidence as to shock one's sense of justice. The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. The fact-finder also has the responsibility of resolving contradictory testimony and questions of credibility. We give great deference to the trial court's decision regarding a weight of the evidence claim because it had the opportunity to hear and see the evidence presented.

*Commonwealth v. Roane*, 204 A.3d 998, 1001 (Pa. Super. 2019) (internal citations and quotation marks omitted).

> One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice. This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. . . . The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary

actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations omitted). A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004) (citations omitted). "In order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Talbert*, 129 A.3d at 545-46 (internal quotation marks and citation omitted). As our Supreme Court has made clear, reversal is only appropriate "where the facts and inferences disclose a *palpable abuse of discretion*[.]" *Commonwealth v. Morales*, 91 A.3d 80, 91 (Pa. 2014) (internal citations omitted).

Appellant argues that the trial court abused its discretion in denying her motion for a new trial because

> there was no physical evidence linking the Appellant to the actual murder of Toy Bryant. . . . the Appellant's admission to [Ms.] Raymond was that she stayed in the car when [Ms.] Bryant was murdered. The cooperating co-defendant Keith Bullock was a corrupt and polluted source. . . . [Ms.] Raymond's statement and her testimony was confused and confusing. . . . Detectives failed

- 24 -

to locate Marcus [Ms. Bryant's boyfriend] to corroborate the Commonwealth's theory of motive.

Appellant's brief at 21. In denying Appellant's motion for a new trial, the trial court determined it was not against the weight of the evidence for the jury to credit the compelling circumstantial evidence "that the handcuffs used in the kidnapping and murder were directly linked to [Appellant] through the handcuff key that she had concealed under her hair weave." Trial Court Opinion (TCO) at 11. "Moreover, the evidence established that after the murder, during which the decedent was repeatedly stabbed, [Appellant] concealed a knife in the couch cushion of her [cousin], Danielle Raymond." *Id.*

As to Appellant's claims pertaining to Keith Bullock, the trial court opined that some inconsistencies in the Commonwealth's evidence do not entitle a defendant to a new trial. *Id.* The trial court pointed out that the jury heard Mr. Bullock testify that he did not tell police all the details surrounding [the victim's] death when he first spoke to police, but eventually he told police everything he knew. TCO at 12. The trial court concluded that even though Mr. Bullock was an accomplice and despite any inconsistencies in his testimony, the jury was free to credit his testimony and his testimony was strongly corroborated by other evidence in the case. *Id.*

Next, as to Appellant's argument that "Danielle Raymond's testimony about what defendant admitted to was confused and confusing," the trial court observed that while Ms. Raymond's trial testimony was inconsistent with her

police statement, a prior inconsistent statement is admissible as substantive evidence even when the witness repudiates the prior statement during her testimony at trial. *Id.* Such prior inconsistent statements alone may be sufficient to sustain a guilty verdict. *Id.* Accordingly, the jury was free to evaluate Raymond's credibility and to credit the clear and highly inculpatory statement that she gave to police notwithstanding her testimony at trial. *Id.*

A prior inconsistent statement is admissible as substantive evidence even when the witness repudiates the prior statement during his testimony at trial. *See Commonwealth v. Brown*, 52 A.3d 1139, 1169-71 (Pa. 2012). As long as the Commonwealth proves that the statement was signed by the witness and adopted at some time prior to trial, it is covered by a hearsay exception. *Id*.; *See also Commonwealth v. Brown*, 134 A.3d 1097, 1104 (Pa. Super. 2016) (although witnesses recanted at trial, the jury was free to credit the witnesses' prior inconsistent statements over their recantations.). Additionally, "the weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Roane*, 204 A.3d at 1001.

Lastly, the trial court opined that whether or not the victim gave the money to Marcus had little probative value. TCO at 13. The trial court opined that the Commonwealth's evidence established motive by demonstrating that the victim stole the money from Ms. Smith and Appellant, and then refused or was unable to return it to them. *Id.* Accordingly, the trial court concluded,

the Commonwealth's failure to call Marcus as a witness did not, in any manner, undermine the strength of the case. *Id.*

Applying the proper standard to this case, we conclude that the trial court did not abuse its discretion in denying Appellant's request for a new trial based on her claim that the verdict was against the weight of the evidence. Appellant essentially requests that we reassess and reweigh the evidence presented at trial. We cannot and will not do so. The jury, as finder of fact, had the duty to determine the credibility of the testimony and evidence presented at trial. *See Talbert*, 129 A.3d 546. The jury found that the credible evidence demonstrated that Appellant possessed the specific intent to kill Toy Bryant. We must give the gravest consideration to the trial court's conclusion because it is the trial court, and not the appellate court, that had the opportunity to hear and see the evidence presented. *See Commonwealth v. Cramer*, 195 A.3d 594, 601 (Pa. Super. 2018) (internal quotation marks omitted). We discern no abuse of discretion in the trial court's denial of Appellant's weight challenge.

Judgment of sentence affirmed.

Judge Ott joins the Memorandum.

Judge Kunselman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/25/19