J-S02032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHARLES BUCKLEY | : | |
| | : | |
| Appellant | : | No. 800 EDA 2020 |

Appeal from the PCRA Order Entered February 3, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011223-2012

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                                      **FILED JUNE 1, 2021**

Appellant Charles Buckley appeals from the order denying his timely first petition filed under the Post Conviction Relief Act[1] (PCRA).  Appellant argues that the PCRA court erred in denying his motion for discovery and in rejecting his claims that trial counsel was ineffective for failing to object to the admissibility of DNA evidence and failing to request a mistrial.[2]  Following our review of the record, we affirm on the basis of the PCRA court's opinion.

---

[1] 42 Pa.C.S. §§ 9541-9546.

[2] As part of his appeal from the final order denying his PCRA petition filed on February 3, 2020, Appellant challenges the PCRA court's April 11, 2019 interlocutory order denying Appellant's motion for PCRA discovery in which he alleged exceptional circumstances pursuant to Pa.R.Crim.P. 902(E)(1).  It is well established that "an appeal of a final order subsumes challenges to previous interlocutory decisions." ***Betz v. Pneumo Abex, LLC***, 44 A.3d 27, 54 (Pa. 2012); ***see also*** Pa.R.A.P. 341, note (providing that "[a] party needs to file only a single notice of appeal to secure review of prior non-final orders

*(Footnote Continued Next Page)*

We adopt the PCRA court's summary of the facts underlying this matter. *See* PCRA Ct. Op., 5/18/20, at 2-4. Briefly, Appellant was charged with numerous crimes related to the murder of Tanisha Finch and attempted murder of Rahim Hartzog. The matter proceeded to trial, and at its conclusion, the jury found Appellant guilty of first-degree murder, attempted murder, aggravated assault, and carrying a firearm in public in Philadelphia.[3] The trial court sentenced Appellant to a term of life imprisonment without the possibility of parole for the murder conviction, a consecutive term of ten to twenty years of incarceration for attempted murder, and a consecutive term of two and one-half to five years of incarceration for carrying a firearm in public in Philadelphia. The aggravated assault conviction merged for sentencing purposes.

Appellant filed post-sentence motions, which the trial court denied on November 7, 2014. Appellant filed a timely direct appeal. On December 11, 2015, we affirmed Appellant's judgment of sentence, and on April 16, 2016, our Supreme Court denied Appellant's petition for allowance of appeal. ***Commonwealth v. Buckley***, 3492 EDA 2014, 2015 WL 8550476 (Pa. Super.

_____

that are made final by the entry of a final order"). We conclude that the appeal from the interlocutory order denying discovery was made final by the order denying Appellant's PCRA petition, and these matters are properly before this Court. ***See Commonwealth v. Watley***, 153 A.3d 1034 (Pa. Super. 2016) (addressing the merits of a challenge to the PCRA court's order denying a motion for discovery as part of the appellant's appeal from the subsequent final order denying his PCRA petition).

[3] 18 Pa.C.S. §§ 2502(a), 901(a), 2702(a), and 6108, respectively.

filed Dec. 11, 2015) (unpublished memo.), *appeal denied*, 136 A.3d 978 (Pa. 2016).

Appellant filed a timely *pro se* PCRA petition on July 27, 2016. The PCRA court subsequently appointed counsel to represent Appellant on May 19, 2017. On January 22, 2019, Appellant filed a counseled motion for discovery pursuant to Pa.R.Crim.P. 902(E)(1). In the discovery motion, Appellant requested forensic examination of an iPhone bearing the telephone number 267-622-1502, which Appellant alleged was in police custody. The PCRA court denied the motion for discovery on April 11, 2019.

Thereafter, counsel filed an amended PCRA petition on August 22, 2019. In the amended PCRA petition, Appellant asserted that trial counsel was ineffective for: (1) failing to object to the admissibility of DNA evidence, specifically the use of Probabilistic Genotyping Statistics; (2) failing to move for a mistrial after a third-party spoke to a juror outside the courthouse; and (3) failing to obtain Appellant's parole file and cross-examine Appellant's State Parole Agent regarding the iPhone with the telephone number 267-622-1502.[4] PCRA Pet., 8/22/19, at ¶¶ 8-18.

On January 13, 2020, the PCRA court issued a notice of its intent to dismiss the PCRA petition without a hearing pursuant to Pa.R.Crim.P. 907. On February 3, 2020, the PCRA court denied Appellant's PCRA petition. Appellant

---

[4] Regarding the iPhone, it was Appellant's contention that his parole records would reflect that his personal telephone number was 267-622-1502, and the Commonwealth provided no evidence this telephone number was used to arrange the murder. Appellant's Brief at 16.

filed a timely notice of appeal on March 1, 2020. Both the PCRA court and Appellant complied with Pa.R.A.P. 1925.

On appeal, Appellant raises the following issues for review:

1. The PCRA court erred as a matter of law and abused its discretion when it denied Appellant's [request] for a new trial [based on trial counsel's alleged ineffectiveness in failing to] object to the admission of DNA evidence obtained from a hooded sweatshirt located near the scene of the crime.

2. The PCRA court erred as a matter of law and abused its discretion when it denied Appellant's [request] for a new trial [based on trial counsel's alleged ineffectiveness in failing to] request a mistrial, or, in the alternative, to have the [trial court] interview each juror regarding third party contact with the jury during deliberations.

3. The PCRA court erred as a matter of law and abused its discretion when it denied Appellant's Discovery Motion requesting that the Police Department conduct a forensic analysis of [Appellant's iPhone with telephone number 267-622-1502 which was allegedly] held in evidence.

Appellant's Brief at 4 (some formatting altered).

Following our review of the record, the parties' briefs, and the well-reasoned conclusions of the PCRA court, we affirm on the basis of the PCRA court's opinion.[5]  **See** PCRA Ct. Op., 5/18/20, at 1-13.  We agree with the

_____

[5] We note that the PCRA court's opinion contains a minor misspelling in its citations to **Commonwealth v. Bracey**, 795 A.2d 935 (Pa. 2001), and **Commonwealth v. Bennett**, 19 A.3d 541 (Pa. Super. 2011).  **See** PCRA Ct. Op., 5/18/20, at 4, 12.  Additionally, we are cognizant that the decision in **Bennett**, a case the PCRA court cited to for the definition of "abuse of discretion," was reversed by our Supreme Court.  **See Commonwealth v. Bennett**, 57 A.3d 1185 (Pa. 2012).  However, the reversal did not concern or disturb the definition of abuse of discretion, and the definition set forth in the
*(Footnote Continued Next Page)*

PCRA court that Appellant was not entitled to discovery and that he failed to establish ineffective assistance of counsel.  *See id.*  Accordingly, we affirm.

Order affirmed.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/01/2021

---

PCRA court's opinion is accurate.  PCRA Ct. Op., 5/18/20, at 12; **see Commonwealth v. McGhee**, 230 A.3d 1277, 1283 (Pa. Super. 2020) (defining abuse of discretion).  Lastly, we note that while the PCRA court stated that it denied Appellant's PCRA petition on January 9, 2020, **see** PCRA Ct. Op., 5/18/20, at 2, the record reveals that the order denying Appellant's PCRA petition was filed on February 3, 2020.

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0011223-2012
:
v. :
:
CHARLES BUCKLEY : 800 EDA 2020

**OPINION**

Rose Marie DeFino-Nastasi, J.          May 18, 2020

**PROCEDURAL HISTORY**

On May 17, 2012, Charles Buckley (the "Petitioner") shot and killed Tanisha Finch (the "decedent") while attempting to kill Rahim Hartzog. On July 28, 2014, the Petitioner was found guilty by a jury, presided over by this Court, of first-degree murder,[1] attempted murder,[2] aggravated assault,[3] and VUFA § 6108.[4] On October 10, 2014, the Petitioner was sentenced to life imprisonment without the possibility of parole for first-degree murder, along with consecutive sentences of ten to twenty years' imprisonment and two-and-one-half to five years' imprisonment for attempted murder and VUFA § 6108 respectively.

On October 20, 2014 the Petitioner filed a Post-Sentence Motion. On October 22, 2014, the Petitioner filed a Supplemental Post-Sentence Motion. On November 6, 2014, the Post Sentence Motions were denied. On December 5, 2014, the Petitioner filed a Notice of Appeal to the Superior Court. On December 11, 2015, the Superior Court affirmed the Petitioner's sentence. On January 4, 2016, the Petitioner filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court. On April 6, 2016, *allocatur* was denied.

---

[1] 18 Pa.S.C. § 2502(a).
[2] 18 Pa.S.C. § 901(a).
[3] 18 Pa.S.C. § 2702(a).
[4] 18 Pa.S.C. § 6108.

**FILED**

'MAY 19 2020

Office of Judicial Records
Appeals/Post Trial

On July 27, 2016, the Petitioner filed a Post-Conviction Relief Act ("PCRA") Petition. On May 22, 2017, PCRA Counsel was appointed. On January 22, 2019, PCRA Counsel filed a Motion for Discovery. On August 22, 2019, the Petitioner filed an Amended PCRA Petition. On October 24, 2019, the Commonwealth filed a Motion to Dismiss the PCRA Petition. The PCRA Petition was denied by this court on January 9, 2020. The Petitioner filed an Appeal to the Superior Court on March 1, 2020. The Petitioner filed a Statement of Matters Complained of Pursuant to Rule 1925(b) on March 30, 2020 raising the following issues:

1. That the PCRA Court erred as a matter of law and abused its discretion when it denied [the Petitioner's] sought after PCRA relief asking for a new trial because of trial counsel's failure to object to the admission of DNA evidence obtained from a hooded sweatshirt located near the scene of the crime.

2. That the PCRA Court erred as a matter of law and abused its discretion when it denied [the Petitioner's] sought-after PCRA relief asking for a new trial because of trial counsel's failure to request a mistrial, or, in the alternative, to have the Court interview each juror regarding third party contact with the jury during jury deliberations.

3. That the PCRA Court erred as a matter of law and abused its discretion when it denied [the Petitioner's] Discovery Motion requesting that the Police Department conduct a forensic analysis of [the Petitioner's] cell phone held in evidence.

## STATEMENT OF FACTS

The Superior Court summarized the facts as follows:

> On May 17, 2012, [the Petitioner] shot and killed Tanisha Finch [the decedent] while attempting to kill Rahim Hartzog.
> Mr. Hartzog and [the Petitioner] had been acquaintances for over ten years, during which they sold drugs together. In January 2012, Mr. Hartzog stopped selling drugs because he became engaged to the [decedent]. Ultimately, however,

he lost his job and started selling drugs again. Although he was not selling drugs with [the Petitioner], he sold drugs to many of the same customers.

Ms. Karen Monk, one of Mr. Hartzog and [the Petitioner's] customers, testified at trial that she contacted [the Petitioner] on the day of the shooting because she wanted to buy drugs on credit. [The Petitioner] told Ms. Monk to call Mr. Hartzog and tell him that she had $100.00 to buy drugs from him, although, as Ms. Monk testified at trial, she only had at most twenty dollars. Ms. Monk called Mr. Hartzog and arranged to meet him at the Getty gas station on Mr. Airy Avenue in Philadelphia.

Mr. Hartzog and the [decedent] drove together and parked outside Ms. Monk's apartment complex across the street from the gas station. When Ms. Monk walked up to Mr. Hartzog's vehicle, she handed the [decedent] a one dollar bill. After Mr. Hartzog told her that she had only given him one dollar instead of $100.00, Ms. Monk ran back towards her apartment.

Soon after Ms. Monk ran away, the [decedent] told Mr. Hartzog that somebody suspicious was walking on the sidewalk approaching their vehicle. Mr. Hartzog testified at trial that he saw a person a few car lengths behind his vehicle who had a hood on and hands in the front pocket of his sweatshirt. As the person walked closer, Mr. Hartzog recognized it was [the Petitioner] and started to drive away. As Mr. Hartzog drove away, [the Petitioner] started shooting at Mr. Hartzog's vehicle, hitting the [decedent] in the head with one of his shots.

After dropping the [decedent] off at the hospital, Mr. Hartzog spoke with the police, told them that he was there when the shooting occurred, and provided a description of the shooter. Initially, Mr. Hartzog did not identify [the Petitioner] as the shooter to the police because there is a "no snitch rule on the streets"; however, he eventually admitted to detectives that [the Petitioner] was the person who shot at him and the [decedent].

At trial, Ms. Chaquita Nabried testified that she heard gunshots in the early morning hours and then heard the rattle of the gate near her apartment. Ms. Nabried looked out of her apartment window and saw a man walk through the breezeway separating her apartment building from the other. She described the man to the police as a black male, five feet nine inches to six feet tall with dark skin, messy hair, maybe braids, and a dark shirt who was carrying a light-colored shirt over his shoulder and who then dropped the light-colored hooded sweatshirt as he walked by her bedroom window.

At trial, the Commonwealth introduced evidence that police recovered seven fired cartridge casings from the scene of the shooting. The Commonwealth also introduced evidence that police recovered an extra-large sweatshirt with gunshot residue from the breezeway between the two buildings. A DNA analysis of genetic material obtained from a hair on the sweatshirt indicated that the DNA mixture was 261.5 times more likely a mixture of DNA from [the Petitioner] and three random unrelated individuals than a mixture from four random unrelated individuals in the African-American population.

At trial, two alibi witnesses testified that [the Petitioner] was at home at the time of the shooting because he was on house arrest and had a 9:00 p.m. curfew.

3

However, on cross-examination, both stated that they did not have any specific recollection about the day that the shooting occurred.

[The Petitioner] testified at his own defense at trial. During his testimony, he explained that on the night of the shooting, Ms. Monk called him to buy drugs and he referred her to Mr. Hartzog because it was past his curfew so he could not leave his home to meet her. He testified that his DNA got on the sweatshirt because while he was selling drugs to Ms. Monk's friends four days prior to the shooting, a man offered to sell him the sweatshirt and a bag of cosmetics, and when he checked to see the size of the sweatshirt his DNA got in the collar.

Superior Court Opinion, December 11, 2015 at 2–4.

## ANALYSIS

### Timeliness

A PCRA petition, including a second or subsequent petition, must be filed within one year of the date the judgment becomes final 42 Pa.C.S. § 9545(b)(1). The Petitioner filed the instant PCRA within the one year time requirement. Therefore, the PCRA petition is timely, and the issues may be addressed on the merits.

### Ineffective Assistance of Counsel

The Petitioner's first two claims are that the court erred in failing to find that trial counsel was ineffective. To raise a successful claim alleging ineffective assistance of counsel, the Petitioner must show "(1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness." *Commonwealth v. Bracy*, 795 A.2d 935, 942 (Pa. 2001) (*quoting Commonwealth v. Kimball*, 724 A.2d 326, 333 (Pa. 1999)).

The law provides that under the P.C.R.A., counsel is presumed to be effective and the defendant bears the burden of establishing ineffectiveness. *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987). In order to establish that trial counsel's representation was deficient, the defendant must prove that the underlying claim has arguable merit and that counsel's conduct

4

lacked any reasonable basis. *Commonwealth v. Durst*, 559 A.2d 504, 505 (Pa. 1989). Further, a defendant cannot be granted any relief absent the additional showing that counsel's conduct adversely affected the outcome of the trial. In assessing a claim of ineffectiveness, when it is clear that the defendant has not met the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Travaglia*, 661 A.2d 352, 357 (Pa. 1995). Counsel cannot be ineffective for failing to pursue a meritless claim. *Commonwealth v. Loner*, 836 A.2d 125, 132 (Pa. Super. 2003).

### 1. *Probabilistic Genotyping Statistics*

The Petitioner's first claim is that the court erred in not finding trial counsel was ineffective for failing to object to the admission of DNA evidence obtained from a hooded sweatshirt located near the scene of the crime. The Petitioner contends that counsel failed to object to the admission of Probabilistic Genotyping Statistics,[5] which have come under intense scrutiny for false inclusions generally, and specifically in the Petitioner's case, the statistical probability of the Petitioner's inclusion in the combination of DNA taken from the sweatshirt was so low as to be prejudicial to the Petitioner and likely to cause confusion to the jury.

The factual basis for this claim is that on the night of the instant murder Ms. Chaquita Nabried looked out of her window upon hearing gunfire and saw a male discard a sweatshirt, which was recovered by police. The sweatshirt was tested for DNA. Since there were multiple contributors, Probabilistic Genotyping was used. A DNA analysis of genetic material obtained from a hair on the sweatshirt indicated that the DNA mixture was 261.5 times more likely a

---

[5] Probabilistic genotyping refers to the use of biological modeling, statistical theory, computer algorithms, and probability distributions to calculate likelihood ratios and infer genotypes of a DNA profile.

5

mixture of DNA from the Petitioner and three random unrelated individuals than a mixture from four random unrelated individuals in the African-American population.

Initially, Petitioner's argument fails since Petitioner testified on his own behalf and stated that he touched the sweatshirt in question, within days of the murder, when one of Ms. Monk's friends tried to sell it to him. The Petitioner was a drug dealer who frequented the neighborhood where Ms. Monk lived to sell drugs and knew people from the area. Therefore, by the Petitioner's own admission, there was a possibility that his DNA would be on the sweatshirt. Furthermore, the defense used the expert testimony regarding the Probabilistic Genotyping Statistics to its advantage, by pointing out that there was a mixture of at least four persons in the DNA recovered and that there was only one reference sample obtained; that of the Petitioner. The defense also elicited testimony from the DNA expert that the DNA statistical calculation was of minimal relevance by getting the expert to admit that it was equally likely that it was "not the defendant" who discarded the sweatshirt after the shooting. Furthermore, Probabilistic Genotyping Statistics was described in great detail to the jury and the court asked the jurors to raise their hands if they did not understand. No juror raised their hand. Therefore, the court did not err in finding that this issue lacked merit.

Assuming that the DNA evidence was more prejudicial than probative and that counsel should have objected, the Petitioner still would not prevail since there was overwhelming evidence of guilt irrespective of the DNA evidence.

The evidence adduced at trial was that the Petitioner and Mr. Hartzog had known each other for ten years and had worked together selling drugs. They stopped working together and eventually ended up competing against each other for the same clientele. Ms. Monk testified that on the day of the murder, she attempted to buy drugs from the Petitioner on credit but was

6

denied. Instead, the Petitioner told her to call Mr. Hartzog, lie about the amount of money that she had to purchase drugs, and arrange a meeting to purchase the drugs from him. While Ms. Monk was trying to arrange a meeting with Mr. Hartzog, the Petitioner was continuously calling her and asking her when Mr. Hartzog was coming.

The testimony of both Mr. Hartzog and Ms. Monk was that they arranged to meet outside of her apartment and Ms. Monk would purchase $100 worth of drugs. However, when Mr. Hartzog arrived, Ms. Monk handed him a rolled up single dollar bill. When Mr. Hartzog unrolled the bill and saw it was one dollar, Ms. Monk said she would be back and ran toward her apartment. Mr. Hartzog presumed it was to get the correct amount of money and return. Ms. Monk claimed that she went back to her apartment, heard gunshots and decided to stay inside.

Mr. Hartzog testified that after Ms. Monk ran off, a suspicious figure approached his vehicle. When the figure got closer, Mr. Hartzog saw that it was the Petitioner and immediately began to drive. As he pulled off, the Petitioner pulled out a gun and started firing at Mr. Hartzog's vehicle. The decedent was a passenger in Mr. Hartzog's vehicle and was shot in the head during the incident.

The Petitioner testified in his own defense and corroborated some of the testimony of Mr. Hartzog and Ms. Monk. Notably, the Petitioner confirmed that he and Mr. Hartzog worked together selling drugs, but disputed that there was a falling out and testified that they were still working together on the night of the murder. The Petitioner confirmed that on the night of the murder, Ms. Monk tried to buy drugs from him on credit and that he told her to call Mr. Hartzog instead, because the Petitioner was on curfew and could not leave the house.

Furthermore, there was evidence presented regarding cell phone activity, retrieved from Ms.Monk's phone, between Ms. Monk and Mr. Hartzog and Ms. Monk and the Petitioner, on the

7

night of the murder. Ms. Monk identified two numbers as belonging to the Petitioner: 267-330-9519 and 267-499-8464. The latter was a number used by whomever was on duty selling drugs and was known as "the Scotty phone".

Ms. Monk's phone log shows that on the night of the murder, Ms.Monk called the Petitioner at 8:27 p.m., at phone number, 267-330-9519; one minute later, she called Hartzog at phone number, 267-230-3635. Ms. Monk called the Petitioner and then Hartzog again. Next, Ms. Monk called Hartzog at 1:43 a.m. Thereafter, at 1:49 a.m., Ms. Monk began receiving calls from "the Scotty phone." She testified that the calls were from the Petitioner. Ms. Monk called "the Scotty phone" at 2:05 a.m., and received a call back at 2:08 a.m. Ms. Monk called the "Scotty phone" at 2:19 a.m., and received a call back. Finally, Ms.Monk called Hartzog at 2:22 a.m., within minutes of the murder. No further phone activity occurred on Ms. Monk's phone for five hours. N.T., 7/23/14 at 57-177.

Based on the foregoing recitation, the evidence against the Petitioner was overwhelming. As such, the Petitioner has failed to prove that the outcome of the trial would likely have been different if the DNA evidence had not been admitted. Therefore, the court did not err in failing to find counsel ineffective.

### 2. Third Party Juror Contact

The Petitioner's second claim is that trial counsel was ineffective for failing to request a mistrial, or, in the alternative, to have the Court interview each juror regarding third-party contact with the jury during deliberations.

Initially, it should be noted that the jury was not yet in deliberation, which should be obvious from the fact that the alternate juror was still present.

The factual basis for this claim is as follows:

8

On July 24, 2015, Juror Fourteen, an alternate juror, was outside with the other jurors during a fire drill, when he was approached by two males that looked familiar. The juror had walked over to a nearby trashcan to discard the remainder of his lunch when the males, who turned out to be the Petitioner's brother and brother-in-law, asked Juror Fourteen if he had gotten enough to eat. Juror Fourteen responded "yes" and walked back to where the other jurors were standing. He pointed at the two males and asked some of the other jurors if the males by the trashcan were the Petitioner's family. The others stated that they had seen the males in the courtroom. Juror Fourteen immediately informed the Court of the interaction. The Court, along with the Commonwealth and trial counsel immediately questioned Juror Fourteen regarding the incident. Notes of Testimony ("N.T."), July 24, 2015 at 124–28.

Juror Fourteen stated:

We had a fire alarm today. We were all taken outside. I took the rest of my sandwich out with me. I didn't finish it. I rolled it up and I walked across catty-corner to go throw it in the trash. I threw it in the trash. I looked up and the one guy said did you have enough to eat, big guy? I said what? The other guy said did you have enough to eat, something you didn't have enough to eat or did you have enough to eat and I was like, yeah, yeah. I turned around and started walking back. I walked back to the rest of the group, said was that the family and they were like yeah and they said you have to tell the court officer.

THE COURT: Did you feel threatened by these two guys?

JUROR: No. I am o.k.

THE COURT: Do you think it will affect-

JUROR: No.

9

THE COURT: They will be removed from the courtroom and sent home anyway. They should know better than to talk to you, although I am not sure they were in the room when I gave my instruction. Some people come in after and they don't even know the instructions. [The juror was then sent back with the other jurors].

THE COURT: You can take that two ways. They are just making conversation. Obviously they are not supposed to but I don't know that it is threatening. Maybe they would have liked it if he answered them and then they could have started a conversation but that didn't happen. So I think that we are okay. We will proceed.

TRIAL COUNSEL: Yes. I see no problem.

THE PROSECUTOR: I agree.

The Court then questioned the two men, Michael Buckley and Alver Griffin. Buckley denied ever speaking to a juror. Griffin stated that he told a juror with a hotdog in his hand "don't eat too much, big guy." The Court reprimanded Griffin and explained that he was not allowed to have contact with any jurors during the course of the trial. All parties agreed to remove the two men from the courtroom and take no further action since the jurors were not alarmed and any further inquiry could highlight the issue. *Id.* at 124–28, 243–47.

There is no *per se* rule mandating a mistrial anytime there is improper or inadvertent *ex parte* contact between a juror and a third party. *Commonwealth v. Mosley*, 637 A.2d 246, 248–49 (Pa. 1993), *Commonwealth v. McCamey*, 154 A.3d 352, 355–56 (Pa. Super. 2017). A mistrial is an extreme remedy, and is only appropriate when an incident occurs that deprives the defendant of a fair trial. *Commonwealth v. Szakal*, 50 A.3d 210, 218 (Pa. Super. 2012). When analyzing an incident that potentially compromises the impartiality and integrity of the jury, the test is whether that was a "reasonable likelihood of prejudice." *Commonwealth v. Bomar*, 104 A.3d 1179, 1121

10

(Pa. 2013) (internal citations omitted). The factors are: (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. *Id.*

In *Commonwealth v. Sneed*, 45 A.3d 1096 (Pa. 2012), a family member of one of the defendant's prior victims approached a juror and commented on the "wind and [the juror's] hairdo." The trial court questioned the one juror who had been approached. Based on the collateral nature of the remarks, the court decided to conduct no further questioning of the jurors, removed the victim's family member and proceeded with the trial.

Whereas in *Commonwealth v. McCamey*, 154 A.3d 352 (Pa. Super. 2017), a juror was walking in the courthouse when an unknown person said to her, "remember; guilty, guilty, guilty." The juror told the rest of the panel what occurred before reporting it to the court. Based on the inflammatory content of the remarks, the court questioned each juror to determine whether they could remain impartial, and found that each of the jurors and alternates to be of fair and impartial mind.

The incident in question was more analogous to that in *Sneed* since the interaction was vague and collateral to the case, as opposed to *McCamey*, where the third party interaction was directly related to the ultimate issue in the case.

In the instant matter, the court, along with counsel, questioned Juror Fourteen and found that the contact in question was minimal and unrelated to the case. It was unclear whether the family members were present to hear the court's instruction regarding having no contact with the jury, so the contact may have been inadvertent. Furthermore, the contact did not provide the jury with any information that it did not already have. Additionally, the juror stated that he was not

threatened by the interaction and that the interaction would not affect his ability to be impartial. As such, there was no reasonable likelihood of prejudice and a mistrial was not warranted. Based on the foregoing, counsel was not ineffective for failing to request that the entire jury be interviewed. Counsel cannot be ineffective for failing to pursue a fruitless course of action.

### 3. Discovery Request

The Petitioner's third claim is that the PCRA court erred as a matter of law and abused its discretion when it denied Petitioner's Discovery Motion requesting that the Police Department conduct a forensic analysis of Petitioner's cell phone held in evidence.

In PCRA proceedings, discovery is only permitted upon leave of court after a showing of exceptional circumstances. 42 Pa. C.S.A. § 9545 (d)(2); Pa.R. Crim.P.902(E)(1). The PCRA and criminal rules do not define the term "exceptional circumstances." Rather, it is for the trial court, in its discretion, to determine whether a case is exceptional and discovery is therefore warranted. *Commonwealth v. Dickerson*, 900 A.2d 407, 412 (Pa. Super 2006). A court's determination regarding the existence of exceptional circumstances will not be disturbed unless the court abused its discretion. *Commonwealth v. Lark*, 746 A.2d 585, 591 (Pa. 2000). An abuse of discretion is not a mere error in judgment. Instead, it is a decision based on bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law. *Commonwealth v. Bennet*, 19 A.3d 541, 543 (Pa. Super. 2011).

In the instant matter, the Petitioner claims that his only cell phone with the number of (267) 622-1502, was confiscated from him upon his arrest. Furthermore, he contends that the two phone numbers identified as belonging to him, at trial, do not belong to him. Therefore, the court should order that the cell phone confiscated upon his arrest be forensically analyzed to show he was not in the area of the murder at the time of the murder.

12

While it is true that the Petitioner's probation officer testified that (267) 622-1502 was the number provided by the Petitioner contained in his file, Mr. Hartzog testified that (267) 622-1502 was only one of the Petitioner's phone numbers. The Petitioner is under the mistaken belief that proof of the absence of the phone at the murder scene equates with proof of his absence from the murder scene. Initially, it should be noted that the Petitioner was not arrested until over two weeks after the murder, so it is not as if he was arrested soon after the murder with this particular phone on his person. Both Ms. Monk and Mr. Hartzog testified that the Petitioner had multiple phone numbers, which would not be unusual for someone who was engaged in criminal activity while on probation. Therefore, the court found that a forensic analysis of the phone would have no evidentiary value and did not constitute "exceptional circumstances" pursuant to 42 Pa. C.S.A. Section 9545 (d)(2).

## CONCLUSION

Based on the foregoing, the court's denial of Charles Buckley's PCRA Petition should be affirmed.

By the Court:

Rose Marie DeFino-Nastasi,

*Commonwealth v. Charles Buckley*
CP-51-CR-0011223-2012
Opinion

## Proof of Service

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P. 114:

Petitioner:               Charles Buckley
                                NJ9533
                                SCI Fayette
                                50 Overlook Drive
                                LaBelle, PA 15450

Type of Service: First-Class Mail

PCRA counsel:            Joseph Schultz, Esq.
                                1518 Walnut St.
                                Suite 808
                                Philadelphia, PA 19102

Type of Service: First-Class mail

District Attorney:        Philadelphia District Attorney's Office
                                Appeals Unit
                                3 South Penn Square
                                Philadelphia, PA 19107

Type of Service: Inter-Office mail

Date: 5/18/2020

Bryan Foster
Judicial Clerk to the
Honorable Rose Marie DeFino-Nastasi

14